In re Angela R. COPELAND, Debtor.

Kevin C. Haney and Marilyn
Sue Melhorn, Plaintiffs,

v.

Angela R. Copeland, Defendant.

Bankruptcy No. 02–30516.
Adversary No. 02–3060.

United States Bankruptcy Court,
E.D. Tennessee.

March 10, 2003.

744

Jenkins & Jenkins Attys., PLLC, Michael H. Fitzpatrick, Esq., Knoxville, TN, for Plaintiffs.

Bailey, Roberts & Bailey, P.L.L.C., N. David Roberts, Jr., Esq., Knoxville, TN, for Defendant/Debtor.

## MEMORANDUM

RICHARD S. STAIR, Jr., Bankruptcy Judge.

This adversary proceeding is before the court upon the Complaint filed by the Plaintiffs, Kevin C. Haney and Marilyn Sue Melhorn, on April 30, 2002, seeking a determination that damages incurred by the Plaintiffs stemming from the sale of a business from the Debtor and her husband to the Plaintiffs are nondischargeable under 11 U.S.C.A. § 523(a)(2)(A) (West 1993).

On January 21, 2003, the Plaintiffs filed a Motion to Alter or Amend (Motion to Amend), requesting permission to amend their Complaint to include 11 U.S.C.A. § 523(a)(2)(B) (West 1993) as a basis for their cause of action against the Debtor. In support of the Motion to Amend, the Plaintiffs aver that their cause of action may more properly lie under § 523(a)(2)(B) and that the facts underlying their claim are indistinguishable regardless of whether the proof supports a determination of nondischargeability under § 523(a)(2)(A) or (B). The Debtor filed a Response to Motion to Alter or Amend on January 24, 2003, in opposition to the Motion to Amend. The court reserved its ruling pending the conclusion of the trial and will address the Motion to Amend in this Memorandum.

▪ Leave to amend is governed by Federal Rule of Civil Procedure 15, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7015, and "shall be freely given when jus-tice so requires." FED. R. CIV. P. 15(a). Additionally, an amendment "relates back to the date of the original pleading when . . . the claim . . . asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." FED. R. CIV. P. 15(c). Here, it is clear that the facts and circumstances upon which the Plaintiffs have relied in support of their cause of action against the Debtor are the same whether they are proceeding under subsection (A) or subsection (B) of § 523(a)(2). Accordingly, the Plaintiffs' Motion to Amend will be granted, and the court will also consider their allegations pursuant to § 523(a)(2)(B) as if this relief was requested in the Complaint.

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(I) (West 1993).

### I

The trial of this adversary proceeding was conducted on January 27, 2003. The record before the court consists of 137 stipulated exhibits introduced into evidence, together with the testimony of six witnesses, Mitchell Adams, Natalic La-Rose, the Plaintiffs,[1] Carole Ireland, and the Debtor.

▪ Additionally, the Plaintiffs, on January 22, 2003, served a subpoena to appear and testify upon Barbara Womack, a reporter with the *Knoxville News–Sentinel*, who appeared with counsel and made an oral motion to quash the subpoena (Motion to Quash), pursuant to Federal Rule of Evidence 501 [2] and Tennessee Code An-

1. Mr. Haney testified regarding the facts and circumstances surrounding this action. Direct examination of Ms. Melhorn was waived based upon her assertion that her testimony would mirror that of Mr. Haney and would therefore be cumulative. Ms. Melhorn was cross-examined by the Debtor's counsel. For convenience, the court refers to Mr. Haney's testimony as that of the Plaintiffs jointly unless otherwise stated.

2. Rule 501 states, in part, that "in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, . . . shall be determined

notated section 24–1–208. This statute, known as Tennessee's Shield Law, provides, in pertinent part:

> (a) A person engaged in gathering information for publication ... connected with or employed by the news media or press ... shall not be required by a court ... to disclose before ... any Tennessee court ... any information or the source of any information procured for publication ....
>
> ....
>
> (c)(1) Any person seeking information or the source thereof protected under this section may apply for an order divesting such protection. Such application shall be made to the judge of the court having jurisdiction over the hearing, action or other proceeding in which the information sought is pending.
>
> (2) The application shall be granted only if the court after hearing the parties determines that the person seeking the information has shown by clear and convincing evidence that:
>
> > (A) There is probable cause to believe that the person from whom the information is sought has information which is clearly relevant to a specific probable violation of law;
> >
> > (B) The person has demonstrated that the information sought cannot reasonably be obtained by alternative means; and
> >
> > (C) The person has demonstrated a compelling and overriding public interest of the people of the state of Tennessee in the information.

TENN. CODE ANN. § 24–1–208 (2000). Tennessee's Shield Law applies to all civil proceedings and concerns confidential and non-confidential information. *Austin v. Memphis Publ'g Co.*, 655 S.W.2d 146, 149 (Tenn.1983). If the party requesting divestiture cannot prove all three requirements of subsection (c)(2) by clear and convincing evidence, the application will be denied. *Id.* at 150; *see also Moore v. Domino's Pizza, L.L. C.*, 199 F.R.D. 598 (W.D.Tenn.2000); *Tenn. ex rel. Gerbitz v. Curriden*, 738 S.W.2d 192 (Tenn.1987); *Dingman v. Harvell*, 814 S.W.2d 362 (Tenn.Ct.App.1991).

■ After hearing arguments by the parties to the Motion to Quash, the court held that there was no probable cause to believe that the information sought was clearly relevant to issues presented and that the Plaintiffs had not presented a compelling public interest in having Ms. Womack testify.[3] The Motion to Quash was orally granted, and the subpoena directing Ms. Womack to testify was quashed. This ruling will be memorialized in the judgment to be entered contemporaneously with the filing of this Memorandum.

## II

Many of the facts underlying the Plaintiffs' Complaint are not in dispute. In May 1999, the Plaintiffs learned that a business known as Heavenly Cheesecakes & Chocolates (HCC) was for sale, and they attempted to obtain further information by

---

in accordance with State law." FED. R. EVID. 501. Because the Plaintiffs sought her testimony in order to support their state law claim that the Debtor and her husband were in a partnership, Tennessee law governs whether or not Ms. Womack is entitled to a privilege.

**3.** The Plaintiffs wanted Ms. Womack's testimony in order to attack the Debtor's credibility. In the court's opinion, attacking a witness's credibility was not what the General Assembly contemplated when it enacted Tennessee's Shield Law, and specifically, subsection (c)(2). This reason does not rise to the "compelling and overriding" necessity expressly stated in the statute.

telephoning HCC. In June 1999, they received a telephone call from the Debtor, who confirmed that HCC's assets were indeed for sale. Negotiations began and were ultimately consummated between the Plaintiffs and the Debtor's husband, Brad Copeland. During these negotiations, Mr. Copeland made several false statements and supplied the Plaintiffs with fabricated documents that falsely represented the financial stability of HCC, including documents representing that sales taxes and reports had been timely filed with the Tennessee Department of Revenue on behalf of HCC.

The closing for the sale of HCC's assets occurred on August 2, 1999, effective as of July 31, 1999 (the Closing). At the Closing, the Plaintiffs remitted the purchase price of $200,000.00.[4] The following documents were executed by the Plaintiffs, Mr. Copeland, and the Debtor: (1) Asset Purchase Agreement; (2) Confidentiality and Non–Competition Agreement; (3) Bill of Sale; (4) Closing Statement; and (5) Sales Tax Affidavit (collectively the Closing Documents). *See* Trial Ex. 8; Trial Ex. 9; Trial Ex. 10; Trial Ex. 7; and Trial Ex. 11. Below the signature line for the Debtor's signature, each document states "Angela Copeland, d/b/a Heavenly Cheesecakes and Chocolates—Knoxville."[5]

Subsequent to the purchase of HCC's assets, the Plaintiffs discovered that the financial affairs of HCC had been greatly misrepresented. Although the Asset Purchase Agreement stated otherwise, the

Plaintiffs learned that (1) the sales tax reports to be filed with the Tennessee Department of Revenue had, in fact, not been filed; (2) the sales taxes for HCC were not current;[6] (3) the sales tax returns had not been filed; (4) financial statements submitted during the negotiations evidencing the financial status of HCC were false; and (5) the oven, freezer, and cooler were not in good working order on the date of the Closing.

As a result of these misrepresentations, the Plaintiffs filed a lawsuit against the Copelands to recover their damages in the Chancery Court for Knox County, Tennessee. After the Debtor became ill and was unable to attend trial, the Plaintiffs filed a voluntary non-suit as to her but proceeded in their trial against Mr. Copeland. Pursuant thereto, on November 8, 2001, the Chancellor rendered her opinion from the bench, finding that Mr. Copeland had defrauded the Plaintiffs, assessing damages against him in the amount of $99,053.00, representing $49,053.00 in consequential damages and $50,000.00 in punitive damages. Pursuant to the Chancellor's bench opinion, a Judgment was entered on November 8, 2001 (the Knox County Chancery Court Judgment). *See* Trial Ex. 141.

▪ The Plaintiffs re-filed their lawsuit against the Debtor in the Knox County Chancery Court on November 15, 2001. The Debtor, thereafter on February 1, 2002, filed her Voluntary Petition under Chapter 7, thereby staying the Plaintiffs'

4. The $200,000.00 purchase price included a $5,000.00 down payment previously remitted to Mr. Copeland. *See* Trial Ex. 7.

5. The Closing Documents were prepared by the Plaintiffs' attorney.

6. At the Closing, Mr. Copeland and the Debtor executed a Sales Tax Affidavit, referenced above, stating that as of the Closing date, their "liability to the Tennessee Department

of Revenue for the payment of sales tax amounts to $0.00" and that they would "promptly file a final State and Local Sales and Use Tax Return with the Tennessee Department of Revenue." *See* Trial Ex. 11. This Affidavit was required by statute and was executed "under oath or the penalties of perjury." *See* Tenn. Code Ann. § 67–6–513 (1998).

prosecution of the Knox County Chancery Court action. On her Schedule F (Creditors Holding Unsecured Nonpriority Claims), the Debtor listed a disputed, unliquidated, contingent, joint litigation claim with Mr. Copeland owing to the Plaintiffs. The Debtor received her discharge on June 19, 2002.[7]

In this adversary proceeding, the Plaintiffs allege that, along with Mr. Copeland, the Debtor is liable to them for the fraudulent misrepresentations that induced them to purchase HCC's assets. First, the Plaintiffs maintain that, although the majority of their negotiations for the purchase of HCC's assets took place with Mr. Copeland, they were initially contacted by the Debtor, who was also present at the Closing on August 2, 1999, and who executed the Closing Documents "d/b/a" HCC. Next, the Plaintiffs argue that because the Debtor held herself out to be a co-owner of HCC not only to them, but also to the general public, the Debtor and Mr. Copeland were general partners in HCC under Tennessee law, whereby the Debtor would also be liable for Mr. Copeland's fraudulent misrepresentations in this dischargeability action. Finally, the Plaintiffs insist that even if the Debtor was not a general partner or co-owner of HCC, she was present at the Closing, she was aware of Mr. Copeland's fraudulent misrepresentations, and she acted with gross reckless disregard when she failed to alert the Plaintiffs, knowing that they were relying upon the statements and documents to their detriment.

The Debtor testified that she was never a co-owner of HCC; instead, arguing that Mr. Copeland was the sole owner, regardless of the fact that she would sometimes assist him at HCC during the store's busiest times. The Debtor insists that she was unaware of Mr. Copeland's misrepresentations regarding the financial status of HCC in that he alone controlled the financial aspects of HCC, in addition to having sole control over their personal household finances. The Debtor testified that she was present at the Closing only because Mr. Copeland commanded her attendance, and that she executed the Closing Documents only because Mr. Copeland told her that she had to because she had originally executed a franchise agreement to use recipes owned by HCC.[8] The Debtor testified that she did not read the Closing Documents prior to executing them, and that once she signed them, she promptly left. The Debtor argues that even though she might have been negligent in failing to read the documents that she signed, she never had any intention of deceiving or defrauding the Plaintiffs. Furthermore, the Debtor maintains that she was unaware of Mr. Copeland's fraudulent misrepresentations to the Plaintiffs, and as such, his liability should not be imputed to her.

### III

■ The nondischargeability of debts is governed by 11 U.S.C.A. § 523, which provides in material part:

---

**7.** "The timely filing of a complaint under § 523(a)(2) ... does not prevent the entry of a discharge. The court can grant the discharge and subsequently declare that a particular debt was not discharged." *Smith v. Bandy (In re Bandy)*, 237 B.R. 661, 663 (Bankr. E.D.Tenn.1999) (citing 11 U.S.C. § 524(a); FED. R. BANKR. P. 4004(c)).

**8.** The Debtor testified that the original franchise owner, Mr. Copeland's aunt, required execution of the franchise agreement by anyone who was privy to the cheesecake recipes, which were confidential, in order to prevent their unauthorized dissemination. A copy of this franchise agreement was not introduced into evidence.

(a) A discharge under section 727,[9] ... of this title does not discharge an individual debtor from any debt—

....

(2) for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive[.]

11 U.S.C.A. § 523 (West 1993 & Supp. 2002). The party seeking a determination of nondischargeability under any subsection of § 523(a) has the burden of proof by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). Additionally, § 523(a) is strictly construed against the creditor and liberally in favor of the debtor. *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert),* 141 F.3d 277, 281 (6th Cir.1998); *Rouse v. Rouse (In re Rouse),* 212 B.R. 885, 887 (Bankr. E.D.Tenn.1997).

 "Since subsection (B) [of § 523(a)(2) ] covers only statements 'respecting a debtor's ... financial condition' and subsection (A) excludes such statements, the subdivisions 'are ... expressly mutually exclusive.'" *First Nat'l Bank v. Pontow,* 111 F.3d 604, 608 (8th Cir.1997)

(quoting *Barclays Am./Bus. Credit, Inc. v. Long (In re Long),* 774 F.2d 875, 877 n. 1 (8th Cir.1985)). However, once a court determines that a debtor committed fraud for the purposes of either subsection of § 523(a)(2), "'any debt' arising from that fraudulent conduct is excepted from discharge." *Alworth v. Levy (In re Levy),* 250 B.R. 638, 642 (Bankr.W.D.Tenn.2000) (citing *Cohen v. de la Cruz,* 523 U.S. 213, 118 S.Ct. 1212, 1216, 140 L.Ed.2d 341 (1998)).

**IV**

 Nondischargeability under § 523(a)(2)(A) requires a showing of "some conduct [by the debtor] which can be fairly said to be 'blameworthy.'" *Commercial Bank & Trust Co. v. McCoy (In re McCoy),* 269 B.R. 193, 198 (Bankr. W.D.Tenn.2001) (citing *Check Control, Inc. v. Anderson (In re Anderson),* 181 B.R. 943, 948 (Bankr.D.Minn.1995)). In other words, "the debtor must be guilty of positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality." *Ozburn v. Moore (In re Moore),* 277 B.R. 141, 148 (Bankr.M.D.Ga. 2002) (quoting *Schweig v. Hunter (In re Hunter),* 780 F.2d 1577, 1579 (11th Cir. 1986)).

 Although a debtor's "fraud may not be implied in law, it may be inferred as a matter of fact ... based on the totality of the circumstances ...." *Palmacci v. Umpierrez,* 121 F.3d 781, 789 (1st Cir.1997). Section 523(a)(2)(A) includes misrepresentations, misleading omissions, and actual fraud. *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich),* 259 B.R. 873, 877 (6th Cir. BAP 2001) (citing

---

**9.** All debts of a Chapter 7 debtor arising prepetition are discharged, "[e]xcept as provided in section 523 of this title ...." 11 U.S.C.A. § 727(b) (West 1993).

*McClellan v. Cantrell,* 217 F.3d 890, 893 (7th Cir.2000)); *see also RecoverEdge, L.P. v. Pentecost,* 44 F.3d 1284, 1292 (5th Cir. 1995) ("When defining the elements of nondischargeability under § 523(a)(2)(A), we have distinguished between actual fraud on the one hand and false pretenses and representations on the other.").

▮ For the purposes of § 523(a)(2)(A), "[f]alse representations and pretenses encompass statements that falsely purport to depict current or past facts." *Peoples Sec. Fin. Co., Inc. v. Todd (In re Todd),* 34 B.R. 633, 635 (Bankr. W.D.Ky.1983). "'[F]alse pretense' involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a 'false representation' which is an express misrepresentation." *Moore,* 277 B.R. at 148 (quoting *Sears Roebuck & Co. v. Faulk (In re Faulk),* 69 B.R. 743, 750 (Bankr. N.D.Ind.1986)).

▮ Actual fraud "consists of any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another— something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." *First Centennial Title Co. v. Bailey (In re Bailey),* 216 B.R. 619, 621 (Bankr.S.D.Ohio 1997); 4 COLLIER ON BANKRUPTCY ¶ 523.08[1][e] (Lawrence P. King ed., 15th ed. rev.2002). "[F]raud may consist of silence, concealment or intentional non-disclosure of a material fact, as well as affirmative misrepresentation of a material fact." *Moore,* 277 B.R. at 148 (quoting *Faulk,* 69 B.R. at 750); *see also Kinsler v. Pauley (In re Pauley),* 205 B.R. 501, 510 (Bankr.W.D.Mich.1997) ("It is well established that fraud by omission may give rise to a nondischargeable debt."); *Drake Capital Sec., Inc. v. Larkin (In re Larkin),* 189 B.R. 234, 239 (Bankr. D.Mass.1995) ("A debtor's silence and fail-

ure to disclose a material fact may constitute a misrepresentation actionable under [§ ] 523(a)(2)(A).") (citing *Caspers v. Van Horne (In re Van Horne),* 823 F.2d 1285, 1288 (8th Cir.1987)).

▮ In the Sixth Circuit, in order for a debt to be determined nondischargeable under § 523(a)(2)(A), the creditor must prove that

(1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of the loss.

*Rembert,* 141 F.3d at 280. Although not specifically stated in *Rembert,* § 523(a)(2)(A) expressly excludes documents dealing with the debtor's financial condition. *See* § 523(a)(2)(A).

**A**

▮ The first prong of the *Rembert* test has three basic elements that must be satisfied: (1) the debtor received money; (2) that was procured through material misrepresentations by the debtor to the creditor; and (3) at the time the debtor made the representations, he either knew that they were erroneous, or he was reckless in failing to determine their veracity.

**1**

▮ It is not necessary that a debtor personally receives money from the creditor in order to satisfy the first element. "The court does not require that the debtor directly and personally receive every dollar lost by the creditor." *Metcalfe v. Waters (In re Waters),* 239 B.R. 893, 902 (Bankr.W.D.Tenn.1999) (citing *Brady v. McAllister (In re Brady),* 101

F.3d 1165, 1172 (6th Cir.1996); *HSSM # 7 Ltd. P'ship v. Bilzerian (In re Bilzerian)*, 100 F.3d 886, 890 (11th Cir.1996); *Luce v. First Equip. Leasing Corp. (Matter of Luce)*, 960 F.2d 1277, 1283 (5th Cir.1992)); *see also Ashley v. Church (In re Ashley)*, 903 F.2d 599, 604 (9th Cir.1990). Instead, "if the debtor benefits in some way from the property obtained through his deception, the debt is nondischargeable." *Waters*, 239 B.R. at 901 (quoting *Bates v. Winfree (In re Winfree)*, 34 B.R. 879, 883 (Bankr.M.D.Tenn.1983)). So, even if the Debtor did not receive the purchase price directly from the Plaintiffs, this element is met if she derived a direct benefit from the funds received by Mr. Copeland. The Plaintiffs must simply demonstrate that the Debtor benefitted "in some way" from the proceeds that they paid to the Copelands at the Closing.

■■■ Although the Plaintiffs did not offer any evidence that the Debtor directly received any of the money herself, they did offer substantial evidence that the Debtor received a direct benefit from the proceeds of the sale of HCC's assets. In July 1997, the Debtor and Mr. Copeland applied for and obtained a Small Business Loan in the amount of $78,000.00 (the SBA Loan) from the United States Small Business Administration, serviced through First Tennessee Bank (FTB). *See* COLLECTIVE TRIAL EX. 154. Pursuant thereto, the Copelands executed a Note, whereby both parties were jointly liable to FTB for the SBA Loan. COLLECTIVE TRIAL EX. 154 (Note). As of the Closing date for the sale of HCC's assets to the Plaintiffs, the payoff balance on the SBA Loan was $66,838.78, which

was paid from the $200,000.00 sale proceeds, as evidenced on the Closing Statement signed by both of the Plaintiffs, as well as Mr. Copeland and the Debtor, both "d/b/a Heavenly Cheesecakes and Chocolates—Knoxville." TRIAL EX. 7. Accordingly, by being released from her liability on the SBA Loan, the Debtor received a direct benefit from the HCC sale proceeds received from the Plaintiffs.[10]

**2**

■■■ Generally, a material misrepresentation can be defined as "substantial inaccuracies of the type which would generally affect a lender's or guarantor's decision." *Candland v. Ins. Co. of N. Am. (In re Candland)*, 90 F.3d 1466, 1470 (9th Cir. 1996); *see also* 4 COLLIER ON BANKRUPTCY ¶ 523.08[1][d] (Lawrence P. King ed., 15th ed. rev. 2002) ("A material fact is one touching upon the essence of the transaction."). On the other hand, "[a] misrepresentation is not material if the creditor knows it is false or 'possesses information sufficient to call the representation into question ....'" *In re Sheridan*, 57 F.3d 627, 635 (7th Cir.1995) (quoting *Mayer v. Spanel Int'l Ltd. (In re Mayer)*, 51 F.3d 670, 676 (7th Cir.1995)).

■■■ The Plaintiffs were required to prove that the Debtor made material misrepresentations, which, by definition, means that the Debtor falsely represented a fact or facts that were significant in the Plaintiffs' decision to purchase HCC's assets, either through her actual statements or through her concealment of facts. However, § 523(a)(2)(A) expressly ex-

10. Additionally, the Plaintiffs offered evidence that the Debtor had benefitted because she has not been required to work outside the home since June 1999. Proof was also introduced that Mr. Copeland used some of the proceeds to pay off the family's credit cards, and in fact, the Debtor did not list any credit card balances on her schedule of unsecured creditors, although she admitted in her deposition that the family had joint credit cards at one time. *See* COLLECTIVE TRIAL EX. 3 (Schedule F); TRIAL EX. 162, page 27, line 26 through page 28, line 19.

cludes written statements reflecting the Debtor's or an insider's financial status. The only specific verbal representation made personally by the Debtor regarding HCC occurred when she first spoke to Mr. Haney over the telephone in May 1999. Mr. Haney testified that during that conversation, the Debtor told him that HCC was very profitable and that "they were very fortunate." This oral representation to Mr. Haney can only legitimately be classified as puffery and opinion, which do not rise to the level of fraud necessary for nondischargeability under § 523(a)(2)(A). *See Smith v. Meyers (In re Schwartz & Meyers)*, 130 B.R. 416, 423 (Bankr. S.D.N.Y.1991). This statement was not a material misrepresentation because this statement does not constitute "the essence" of the transaction.[11]

On the other hand, many of the Closing Documents executed by both the Debtor and Mr. Copeland do not make any representations regarding HCC's financial condition; however, written representations contained therein constituted material misrepresentations. First, the Asset Purchase Agreement provides, in part:

> 6. *Representations and Warranties of Seller.* Seller represents and warrants to the Purchaser, which representations and warranties shall survive the Closing and which representations and warranties are fundamental to this Agreement and are being relied upon by Purchaser in executing this Agreement and purchasing the Assets as contemplated hereunder, as follows:
>
> (a) Seller has good and marketable title to the Assets being sold to Purchaser herein, has full power and authority to convey the same and will convey the same to Purchaser free and clear of all encumbrances. All equipment being purchased by Purchaser hereunder shall be in good working condition as of the date of Closing.
>
> . . . .
>
> (d) Seller has filed with the appropriate governmental agency all tax returns required to be filed by him and the business and there are neither unpaid nor proposed assessments of deficiency of federal or state income taxes pending against the Seller. All liability for federal, state and local taxes of whatsoever nature has been paid or will otherwise be provided for by Seller at the appropriate due date.
>
> . . . .
>
> (h) Seller has delivered to Purchaser true and complete copies of its financial statements and related statements of income and balance sheets of the Business ("Financial Statements") as part of Purchaser's due diligence, and

---

**11.** Conversely, the Plaintiffs testified, without rebuttal, that Mr. Copeland did make several false oral statements regarding HCC and what it was worth. Specifically, Mr. Copeland indicated to the Plaintiffs that the profits in 1998 were approximately $91,000.00, when in fact, it was later discovered that the profits were closer to $50,000.00. *See* Trial Ex. 4; Trial Ex. 5. In addition to these representations, Mr. Copeland provided the Plaintiffs with a General Prospectus, which included many documents reflecting the financial status of HCC such as profit/loss statements, a balance sheet, and monthly sales figures. *See* Collective Trial Ex. 146. Mr. Copeland also gave copies of documents relating to a prior offer to purchase HCC's assets by Dr. Francis Roy to the Plaintiffs, consisting mainly of financial statements and tax documents. *See* Collective Trial Ex. 147, discussed in section VI, part A, *infra*. Although the Plaintiffs later learned that many of Mr. Copeland's representations were false, by virtue of the plain language of § 523(a)(2)(A), these statements cannot form the basis of the Plaintiffs' claim of nondischargeability. *See Armbrustmacher v. Redburn (In re Redburn)*, 202 B.R. 917, 924 (Bankr.W.D.Mich.1996) ("An oral misrepresentation of financial condition is not actionable.").

such Financial Statements present fairly in all material respects the financial position and results of operation of Seller as of the dates thereof and for the periods indicated.

Trial Ex. 8.

Similarly, the Bill of Sale provides that "Sellers do hereby sell, assign, transfer, convey and deliver, with all of..the representations, warranties, guarantees and indemnities, all of their right, title and interest in and to all of the Assets .listed on Exhibit A, attached hereto." Trial Ex. 10.

The Asset Purchase Agreement specifically states that many of the representations that turned out to be false were "fundamental" to the transaction. *See* Trial Ex. 8. The Plaintiffs had no knowledge that these representations were false, and Mr. Haney testified that had they known, the Plaintiffs would not have executed the Closing Documents and purchased HCC's assets. There is no question that the misrepresentations made to the Plaintiffs were material.

**3**

 The final part of the first element requires a showing that the debtor either knowingly made false representations or acted with reckless disregard for the truth in making representations without confirming their accuracy. "Knowing" means "[h]aving or showing awareness or understanding" and includes conscious or deliberate acts. Black's Law Dictionary 876 (7th ed.1999). As applied to § 523(a)(2)(A), "the concept of misrepresentation includes a false representation as to one's intention, such as a promise to act. 'A representation of the maker's own intention to do ... a particular thing is fraudulent if he does not have that inten-

tion' at the time he makes the representation." *Palmacci,* 121 F.3d at 786 (quoting Restatement (Second) of Torts § 530(1)). "Reckless disregard" is defined as "[c]onscious indifference to the consequences (of an act)." Black's Law Dictionary 1276 (7th ed.1999). Similarly, "[r]ecklessness involves a greater degree of fault than negligence but a lesser degree of fault than intentional wrongdoing." Black's Law Dictionary 1277 (7th ed.1999).

> However, "reckless disregard" should be very narrowly interpreted.... A "line is to be drawn between an intent to mislead and mere negligence. An honest belief, however unreasonable, that the representation is true and the speaker has information to justify it [has been] held ... to be no sufficient basis for deceit."

*Nat'l City Bank v. Manning (In re Manning),* 280 B.R. 171, 191 (Bankr.S.D.Ohio 2002) (quoting *Chevy Chase Bank FSB v. Kukuk (In re Kukuk),* 225 B.R. 778, 787 (10th Cir. BAP 1998)).

 Accordingly, the Plaintiffs must prove that the Debtor either knew that the representations made to them were false or that she acted with such reckless disregard for the truth of the representations that she should be culpable. The Debtor testified that she attended the Closing only because Mr. Copeland asked her to, that she signed the Closing Documents only because she thought she was transferring her rights to the recipes, and that she did not read the Closing Documents before signing them because she was concerned with returning to her month-old baby and because she trusted what Mr. Copeland told her.[12]

---

12. There is inconsistent testimony as to how long the Debtor was actually in attendance at the Closing. The Debtor testified that she was only there for approximately one-half hour, just long enough to execute the Closing Documents and leave. The Plaintiffs testified that the Debtor was present at the Closing for almost the entire two hours, and that she

However, had the Debtor read the Closing Documents prior to signing them, she could have discovered the material misrepresentations made therein. For example, the cover page of the Asset Purchase Agreement specifically provides that the Sellers are "Brad and Angela Copeland, d/b/a Heavenly Cheesecakes & Chocolates" for the purchase price of $200,000.00. TRIAL Ex. 8. Additionally, as to the Debtor's contention that she was signing the Closing Documents only to transfer her rights to the recipes, the Asset Purchase Agreement provides, in material part:

13. *Assets Not Being Transferred.* It is specifically understood and agreed that those assets of Seller set forth on *Exhibit C* attached hereto and made a part hereof are not being transferred as part of this transaction and shall be and remain property of Seller and/or others.

. . . .

### EXHIBIT C

. . . .

Any intellectual property, including any tradenames [sic], trademarks, servicenames [sic], servicemarks, other designs, copyrights, patents, emblems, insignia, symbols, slogans, tradesecrets [sic], or other material of any nature whatsoever developed by or for the benefit of Heavenly Cheesecakes and Chocolates, Inc., Holly Hill, Florida, a corporation organized under the laws of the State of Florida.

The Licensing Agreement, executed in January 1998 by and between Heavenly Cheesecakes and Chocolates, Inc. ("Corporation") and Brad and Angela Copeland, and any and all property licensed thereunder and any rights or liabilities arising thereunder, including any exclusive license to do business under the tradename [sic] "Heavenly Cheesecakes and Chocolates," any permission for use of the Angel trademark, any goodwill associated with the tradename [sic] and the trademark, and trade secrets of the Corporation such as any proprietary and confidential information regarding business operations, formulae, techniques and methods of operations used by the Corporation.

TRIAL Ex. 8.

Because the Debtor admitted that she did not read the Closing Documents before she signed them, it cannot be concluded that she knowingly made false representations, either directly or by omission, when she failed to alert the Plaintiffs that information in the Closing Documents was incorrect. Nevertheless, the fact remains that she did sign the Closing Documents, most notably the Asset Purchase Agreement, which contained material misrepresentations regarding the payment of sales taxes, the condition of the equipment being sold, and the due diligence of Mr. Copeland and the Debtor as sellers in providing financial information to the Plaintiffs. *See* TRIAL Ex. 8; TRIAL Ex. 11. When the Debtor signed the Closing Documents, she became responsible for their content, regardless of her reasons for signing them. The Debtor admitted that she could have read the Closing Documents before signing them, but that she made the conscious choice not to read them. When questioned about whether she believed that she owed an obligation to anyone else, other than herself or Mr. Copeland, regarding the contents of documents that she has signed without reading, the Debtor responded in the negative. The court is concerned by this testimony and the Debtor's apparent apathy and indifference concerning docu-

---

might have left and returned, but that she was in attendance longer than half an hour.

ments that she has executed and the consequences imposed upon others as a result thereof.

The Debtor is an intelligent, educated, articulate woman with some business sense. At trial, she boasted proudly that she has been home-schooling her oldest child in Economics for approximately four years, and that the child is now at a fifth grade level in that subject.[13] Additionally, the Debtor admitted that she and Mr. Copeland purchased a house in the past and later took out a home equity line of credit on the house. In both cases, she was required to sign documents, and she knew that she, as well as Mr. Copeland, was obligated on the loans.

The Plaintiffs have not submitted evidence sufficient to rebut the Debtor's assertions that she did not know that the Closing Documents contained material misrepresentations. In fact, the only rebuttal evidence provided by the Plaintiffs was their testimony that the Debtor was present at the majority of the Closing, that she talked with Mr. Copeland throughout the Closing, and that she never read any of the Closing Documents before executing them. On the other hand, the Debtor's cavalier demeanor regarding the contents of the documents that she signed and her own responsibility to others regarding what they represented exhibit reckless behavior, with no concern for the consequences of her actions. The court is convinced that the Debtor acted with gross recklessness as to the truth of the Closing Documents by not reading them prior to signing them. Her explanation that she was only signing away her interest in the recipes coupled with her testimony that she signed the Closing Documents without reading them because she relied upon and trusted Mr. Copeland is not sufficient when examined along with the myriad of misrepresentations made to the Plaintiffs and the Debtor's education and obvious intelligence.[14]

**B**

■■■■ A subjective measure is used to determine a debtor's intent to deceive, the second *Rembert* element. *Rembert,* 141 F.3d at 281 (citing *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995)). A debtor intends to deceive a creditor "when the debtor makes a false representation which the debtor knows or should have known would induce another

---

13. In addition, the Debtor testified that she home-schools her oldest child not only in the regular fifth grade curriculum and economics, but also in chemistry and Hebrew, as well as two musical instruments. The Debtor also displayed an extensive knowledge of grammar at her deposition when questioned about whether Mr. Copeland was "representing" her, and she answered "The only thing he would have represented, since I don't have a dictionary and a Thesaurus, and the Greek and Latin Lexicography, which I will be glad to do, if you'll allow me to clarify my usage of the word represent, that telling the buyers that she has the—that she has the rights to the recipes." TRIAL EX. 162, page 38, lines 5 through 14.

14. The Debtor's actions and assertions in the case at bar are similar to those addressed by the Fifth Circuit in *Luce v. First Equip. Leasing Corp. (Matter of Luce),* 960 F.2d 1277 (5th Cir.1992). In *Luce,* the "innocent" spouse also executed documents at the request of her husband of twenty-five years without asking questions to determine their veracity, characterizing herself as "an innocent, trusting, naive wife." *Id.* at 1284 n. 10. The court stated that it viewed the issue of imputation as one concerning business partners and that it was irrelevant that the business partners "also enjoyed a marital relationship." *Id.* Additionally, the court noted that "[t]he picture of Billye Luce as a woman who dutifully served her husband's interests without questions and without options ignores the import of her college education and extensive business experience." *Id.*

to advance goods or services to the debtor." *Bernard Lumber Co. v. Patrick (In re Patrick)*, 265 B.R. 913, 916 (Bankr. N.D.Ohio 2001). "Fraudulent intent requires an actual intent to mislead, which is more than mere negligence.... A 'dumb but honest' [debtor] does not satisfy the test." *Palmacci*, 121 F.3d at 788 (citations omitted). A debtor's fraudulent intent

> may be inferred from the totality of the circumstances. The bankruptcy court must consider whether the totality of the circumstances "presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor." The court may consider not only the debtor's conduct at the time of the representations, but may consider subsequent conduct, to the extent that it provides an indication of the debtor's state of mind at the time of the actionable representations.

*Wolf v. McGuire (In re McGuire)*, 284 B.R. 481, 492 (Bankr.D.Colo.2002) (quoting *Groetken v. Davis (In re Davis)*, 246 B.R. 646, 652 (10th Cir. BAP 2000) (citations omitted)). "A creditor can present proof of surrounding circumstances from which a[c]ourt can infer a dishonest intent." *McCoy*, 269 B.R. at 199.

■■■ Proving the Debtor's intent to defraud is similar to proving the Debtor's knowledge and/or recklessness as to the falsity of the representations made. Because intent is a purely subjective question, the court must examine the totality of the Debtor's actions to determine if she possessed the requisite intent to deceive the Plaintiffs. Any benefit of the doubt must be resolved in favor of the Debtor, as § 523(a)(2) is strictly construed in her favor. *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443, 1452 (6th Cir.1994).

■■■ As previously concluded, the Debtor acted with reckless indifference when she executed the Closing Documents without reading them. Again, the court recalls the Debtor's assertions that she does not owe an obligation to anyone else regarding the contents of documents that she has executed. Additionally, the Debtor's inconsistent testimony regarding what she knew about the family's financial status at the time HCC's assets were sold to the Plaintiffs displays some element of concealment of the truth. Further, the court does not believe that the Debtor is as unsophisticated or oblivious regarding HCC, its finances, or her own household finances as she attempted to convey at trial. The court is not convinced that Mrs. Copeland is a "dumb but honest debtor." *See Palmacci*, 121 F.3d at 788.

On the other hand, fraudulent intent requires proof of an intent on her part to mislead the Plaintiffs, which has not been shown. Throughout her testimony, the Debtor insisted that she was unaware that any fraud was occurring and that she had no fraudulent intent towards the Plaintiffs. Additionally, the Plaintiffs introduced no evidence to indicate otherwise. The gist of the Plaintiffs' argument against the Debtor is that she should have alerted them to misrepresentations in the Closing Documents at the Closing. But, given the undisputed proof that the Debtor did not read any of the Closing Documents prior to signing them, even though she should have known the contents of the statements contained therein, clearly, she did not. Although the court believes that the Debtor's actions and/or inactions rise above mere negligence to a level of gross recklessness, the court cannot conclude that the Debtor's conduct rose to the level of actual fraud or deceit as required by § 523(a)(2)(A). Accordingly, this element has not been satisfied.

### C

■■■ The inquiry into whether a creditor's reliance is justifiable, the third

*Rembert* element, is also subjective, based on the facts and circumstances surrounding each individual case. *McCoy*, 269 B.R. at 198. A logical prerequisite for justifiable reliance is a showing by the creditor that it "actually relied" and that its reliance was then justifiable. *See Pauley*, 205 B.R. at 506–07 (citing *AT & T Universal Card Servs. v. Alvi (In re Alvi)*, 191 B.R. 724, 730–31 (Bankr.N.D.Ill.1996)). "Under this standard, a creditor will be found to have justifiably relied on a representation even though 'he might have ascertained the falsity of the representation had he made an investigation.'" *McCoy*, 269 B.R. at 198 (quoting *Mans*, 116 S.Ct. at 444). Hence, the determinative issues are whether the Plaintiffs actually relied upon the misrepresentations and, if so, whether their reliance was justified, based upon the facts and circumstances existing at that time.

■ First, as to actual reliance, the Plaintiffs testified that they would not have purchased HCC's assets had they known that representations contained in the Closing Documents were false. Additionally, the Asset Purchase Agreement specifically provides that "representations and warranties [by the Sellers] are fundamental to this Agreement and are being relied upon by Purchaser in executing this Agreement and purchasing the Assets as contemplated hereunder." TRIAL EX. 8. Finally, the Plaintiffs testified that they were aware that HCC had a reputation in the community for having good cheesecakes and that they had seen at least one newspaper article concerning HCC prior to their offer to purchase its assets. They testified that these "goodwill" considerations also played a part in their decision to purchase HCC's assets. It is clear that the Plaintiffs actually relied upon the representations made to them during the negotiations for the purchase of HCC's assets and at the Closing, in conjunction with the Closing Documents.

Additionally, the court finds that the Plaintiffs were justified in relying upon these representations. They initially contacted the Copelands about purchasing HCC's assets because they knew of HCC's reputation in the community. The Plaintiffs engaged legal counsel to prepare the Closing Documents according to specifications provided to them by Mr. Copeland and to then represent them at the Closing. It appears to the court that the Plaintiffs took every precaution in their purchase of HCC's assets, and that based upon the circumstances presented, they were justified in their reliance upon the misrepresentations perpetrated indirectly by the Debtor.

**D**

■ Finally, the creditor's reliance on the Debtor's misrepresentations must have been a proximate cause of the loss sustained by the creditor in order to satisfy the fourth *Rembert* element. "Proximate cause is something more than 'speculation as to what the creditor might have done in hypothetical circumstances.'" *Candland*, 90 F.3d at 1470 (quoting *Siriani v. Northwestern Nat'l Ins. Co. (In re Siriani)*, 967 F.2d 302, 306 (9th Cir.1992)). It depends "on whether the [debtor's] conduct has been so significant and important a cause that the [debtor] should be legally responsible." *Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir.1991); *see also United States v. Spicer*, 57 F.3d 1152, 1157 (D.C.Cir.1995). In summary, there must be "a direct link between the alleged fraud and the creation of the debt." *McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 n. 7 (1st Cir.2001).

■ As proof that the misrepresentations by the Debtor and Mr. Copeland were the proximate cause of their loss, the

Plaintiffs testified that they purchased HCC's assets based upon the execution of the Closing Documents containing misrepresentations that they subsequently learned were false. The Plaintiffs testified that they were forced to expend over $10,000.00 of their own money into the business to cure tax deficiencies, to reopen after the Closing,[15] and to keep it open until October 1999, when they determined that the business was not going to be profitable, and they closed it. The Plaintiffs also testified that, after closing their business, they attempted to liquidate the hard assets purchased from HCC, most notably, the equipment, but because the condition had been grossly misrepresented, they were only able to sell the equipment for $3,070.00.

Again, clearly, there is a direct link between the representations and the creation of the debt. Had they not relied upon the misrepresentations of the Copelands, the Plaintiffs would not have closed the purchase of HCC's assets. In turn, they would not have paid a $5,000.00 down payment, they would not have paid off the Copelands' SBA Loan in the amount of $66,383.78, and they would not have given the Copelands $128,161.22 at the Closing. *See* TRIAL Ex. 7. Moreover, had the Debtor and Mr. Copeland not misrepresented the condition of the equipment in the Asset Purchase Agreement, the Plaintiffs would not have expected to resell it for a greater price than $3,070.00.

### E

Applying the facts of this case to the *Rembert* requirements, the court finds that the Plaintiffs have failed to meet their burden of proof that the Debtor's actions or inactions rise to the level of fraud necessary for nondischargeability under § 523(a)(2)(A). Because all elements must be met for nondischargeability under § 523(a)(2)(A), the Debtor's actions and/or inactions do not give rise to a nondischargeable debt.

### V

However, simply because the actions or inactions of the Debtor, herself, do not convince the court that she had an actual intent to defraud the Plaintiffs, the court is persuaded that Mr. Copeland possessed the requisite intent to deceive. Mr. Copeland's intent could possibly be imputed to the Debtor for the purposes of § 523(a)(2)(A), if the court finds that the Debtor and Mr. Copeland operated HCC as a partnership, based upon the rule in the Sixth Circuit that

> a partner's fraudulent acts are imputed to an innocent debtor-partner for purposes of determining dischargeability [if] . . . (1) the debtor was a partner; (2) the debtor's partner committed fraud "while acting on behalf of the partnership [ ] in the ordinary course of the business;" and (3) as a partner, the debtor "shared in the monetary benefits of the fraud."

*Lail v. Weaver (In re Weaver)*, 174 B.R. 85, 89 (Bankr.E.D.Tenn.1994) (quoting *BancBoston Mortgage Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556, 1561–62 (6th Cir.1992)). This decision is based, in part, upon the undisputed fact that, under Tennessee partnership and agency law, one partner is liable for the fraud of another, regardless of his own culpability. *See Ledford,* 970 F.2d at 1561.

Accordingly, if the Debtor and Mr. Copeland are deemed to be partners, any fraud perpetrated upon the Plaintiffs by Mr. Copeland will be imputed to the Debtor, giving rise to a nondischargeable debt under § 523(a)(2)(A) since the Plaintiffs proved, by a preponderance of the evi-

---

**15.** The Plaintiffs operated their business under the name of Desserts Divine.

dence, the other elements of this subsection as they pertained to the Debtor.

### A

Under the *Ledford* test, the first question before the court is whether the Debtor and Mr. Copeland operated HCC as a partnership. This question is a matter of state law, and because HCC was organized and operated in the state of Tennessee, Tennessee law will govern.

 First, the court observes that there is not an assumed partnership between the Debtor and Mr. Copeland simply because they are married. *See Martin v. Coleman,* 19 S.W.3d 757, 761 (Tenn. 2000); *accord Ledford,* 970 F.2d at 1561; *Luce,* 960 F.2d at 1284 n. 10. "[T]he ordinary laws pertaining to partnership, not the laws of domestic relations, apply in a situation in which a business partnership can be implied from the facts and circumstances, a meretricious relationship notwithstanding." *Martin,* 19 S.W.3d at 761 (quoting *Bass v. Bass,* 814 S.W.2d 38, 44 (Tenn.1991)). "[T]here is no doubt that a married person may be authorized to act for the other spouse, but authority in this connection will not be implied from the marital relation." *Goode v. Daughtery,* 694 S.W.2d 314, 317 (Tenn.Ct.App.1985) (quoting 41 Am. Jur. 2d *Husband and Wife* § 241 (1968)). "A partnership [must be] implied ... while completely ignoring the parties' social relationship." *Bass,* 814 S.W.2d at 44.

In Tennessee, a partnership is "an association of two (2) or more persons to carry on as co-owners of a business or other undertaking for profit formed under § 61–1–202, predecessor law, or comparable law of another jurisdiction." Tenn. Code Ann. § 61–1–101(6) (2002). In this case, predecessor law is that existing in 1999, when

the sale of HCC's assets occurred. In 1999, Tennessee operated under the Uniform Partnership Act, with virtually the same definition for a partnership: "an association of two (2) or more persons to carry on as co[-]owners a business for profit ...." Tenn. Code Ann. § 61–1–105(a) (1999).

Specifically, pertaining to the determination of the existence of a partnership, the Uniform Partnership Act, as enacted in Tennessee, provided, in part:

In determining whether a partnership exists, these rules shall apply:

(1) Except as provided by § 61–1–115 persons who are not partners as to each other are not partners as to third persons;

(2) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether such co[-]owners do or do not share any profits made by the use of the property;

. . . .

(4) The receipt of a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:

(A) As a debt by installments or otherwise;

(B) As wages of an employee ...;

. . . .

(D) As interest on a loan, though the amount of payment vary [sic] with the profits of the business[.]

Tenn. Code Ann. § 61–1–106 (1999).[16] Section 61–1–115 was entitled "Partnership by Estoppel" and provided that:

(current law governing formation of a part-

**16.** *See also* Tenn. Code Ann. 61–1–202 (2002)

(a) When a person, by words spoken or written or by conduct, represents himself, or consents to another representing him to anyone, as a partner in an existing partnership or with one (1) or more persons not actual partners, he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership, and if he has made such representation, or consented to it being made in a public manner, he is liable to such person, whether the representation has or has not been made or communicated to such person so giving credit by or with the knowledge of the apparent partner making the representation or consenting to it being made.

(1) When a partnership liability results, he is liable as though he were an actual member of the partnership;

(2) When no liability results he is liable jointly with the other persons, if any, so consenting to the contract or representation as to incur liability, otherwise separately;

(b) When a person has been thus represented to be a partner in an existing partnership, or with one (1) or more persons not actual partners, he is an agent of the persons consenting to such representation to bind them to the same extent and in the same manner as though he were a partner in fact, with respect to persons who rely upon the representation. Where all the members of the existing partnership consent to the representation, a partnership act or obligation results, but in all other cases it is the joint act or obligation of the

person acting and the person consenting to the representation.

TENN. CODE ANN. § 61–1–115 (1999).[17]

▮▮▮▮ What constitutes a partnership is a matter of law, but whether a partnership exists "under conflicting evidence" is a question of fact. *Wyatt v. Brown*, 39 Tenn.App. 28, 281 S.W.2d 64, 67 (1955). The party alleging the existence of a partnership bears the burden of proof by clear and convincing evidence. *See Taylor v. Bush (In re Taylor & Assocs., L.P.)*, 249 B.R. 431, 447 (E.D.Tenn.1997); *In re Taylor & Assocs., L.P.*, 249 B.R. 448, 468–69 (Bankr.E.D.Tenn.1998); *Pettes v. Yukon*, 912 S.W.2d 709, 715 (Tenn.Ct.App.1995).

▮▮▮▮ Partnership status is created by either an express or implied contract of partnership, but there is no requirement that the parties actually intended to become partners. *Bass*, 814 S.W.2d at 41 (citing *Wyatt*, 281 S.W.2d at 67). When there is no written contract, the intent to form a partnership may be derived from the parties' actions. *Wyatt*, 281 S.W.2d at 67. When determining whether a partnership exists, courts must consider the totality of all relevant facts and circumstances "where it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience, or money." *Pettes*, 912 S.W.2d at 715 (quoting *Bass*, 814 S.W.2d at 41). "It is not necessary that the parties intend to actually form a partnership or even that they know the legal result of their actions is to create a partnership." *Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 45 S.W.3d 588, 605 (Tenn.Ct.App.2001). The pooling of "money, assets, labor, or skill ... [results in] a partnership whether or

nership under the Revised Uniform Partnership Act adopted by Tennessee).

**17.** *See also* TENN. CODE ANN. 61–1–308 (2002) (current law governing "purported partnerships" under the Revised Uniform Partnership Act adopted by Tennessee).

not the parties understood that it would be so." *Bass,* 814 S.W.2d at 41 (citing *Pritchett v. Thomas Plater & Co.,* 144 Tenn. 406, 232 S.W. 961, 969–70 (1921)).

■ Here, regardless of any actual agreement between the Debtor and Mr. Copeland to form a partnership, their actions speak volumes and convince the court that the Debtor and Mr. Copeland "entered into a business relationship for profit, combining their property, labor, skill, experience, or money." *Bass,* 814 S.W.2d at 41 (footnote omitted).

First, the record is replete with evidence that the Debtor and Mr. Copeland combined their property and money into HCC. The Plaintiffs asserted, and the Debtor acknowledged, that many of her payroll checks earned as a dental hygienist were deposited into HCC's checking account. In fact, from June 1998 to June 1999, the Debtor earned $18,476.00 from her employment as a dental hygienist, which was deposited into the HCC checking account. *See* Trial Ex. 123. The Debtor argued first that, based upon her religious upbringing, Mr. Copeland was the head of their household and that the finances were his responsibility alone.[18] She stated that she simply endorsed her paychecks and gave them to Mr. Copeland to do with as he pleased. However, in her deposition, the Debtor testified that she gave her paychecks to Mr. Copeland as "loans" and that he repaid her by keeping money for home-school supplies and saving for them to attend seminary. *See* Trial Ex. 162, page 29, line 10 through page 30, line 27.

The court does not question the Debtor's religious beliefs. However, under Tennessee law, it makes no difference that the Debtor and Mr. Copeland believed that Mr. Copeland was solely in charge of the finances. The fact that her paychecks were intermingled with HCC monies means that the Debtor was financially contributing to HCC, whether she actually meant to or not. Further, her testimony that she "loaned" Mr. Copeland her wages suggests that she was actually aware that those funds were being infused into HCC.

In addition to the Debtor's payroll checks, Mr. Copeland deposited his own payroll checks into the HCC checking account. *See* Trial Ex. 92; Trial Ex. 93; Trial Ex. 94; Trial Ex. 95; Trial Ex. 100; Trial Ex. 101; Trial Ex. 102; Trial Ex. 103; Trial Ex. 107; Trial Ex. 108; Trial Ex. 110; Trial Ex. 111; Trial Ex. 115; Trial Ex. 116; Trial Ex. 121; Trial Ex. 122. Also, checks payable to the Debtor and Mr. Copeland of a personal nature, including their joint income tax refunds, gifts, and loans, were deposited into HCC's checking account. *See* Trial Ex. 30; Trial Ex. 45; Trial Ex. 59; Trial Ex. 60; Trial Ex. 70; Trial Ex. 71; Trial Ex. 76; Trial Ex. 77; Trial Ex. 87; Trial Ex. 88; Trial Ex. 117; Trial Ex. 118.

Along those same lines, the Debtor testified that she and Mr. Copeland were the signatories on the HCC checking account. This is evidenced by the signature card for the checking account, executed by both the Debtor and Mr. Copeland. *See* Collective Trial Ex. 153 (Signature Card).[19] However, it appears that the Debtor was

18. The court takes judicial notice, however, that in her deposition, the Debtor was not quite so forceful in her assertions that Mr. Copeland alone handled the finances. *See* Trial Ex. 162, page 14, lines 3 through 5 ("Q: Did you handle the money, or did someone else handle the money? A: Usually, Brad did.").

19. The court notes that the Debtor's signature appears first on the Signature Card. *See* Collective Trial Ex. 153 (Signature Card). Additionally, the "Contact Name" lists "ANGELA OR BRADLEY COPELAND." Collective Trial Ex. 153 (Signature Card).

the person who applied to open the HCC checking account. In fact, it was the Debtor, alone, who executed an Unincorporated Individual Operating Under Trade Name Authority to Open Deposit Account (Sole Proprietorship) application on March 5, 1997, which states, in part:

> The undersigned desire to establish with First Tennessee Bank National Association (hereinafter referred to as the "Bank") a deposit and checking account to [sic] known as HEAVENLY CHEESECAKES & CHOCOLATES ... and hereby certifies that said name is a trade name used in the conduct of an unincorporated business owned entirely by the undersigned. Checks and orders for the payment of money withdrawing funds from said account may be signed by: ANGELA COPELAND, BRADLEY COPELAND.
>
> . . . .
>
> If any other persons become interested in said business as co-partners of the undersigned or if the business should become incorporated, the undersigned hereby agrees to promptly notify Bank in writing.
>
> The undersigned further expressly authorizes and empowers ANGELA COPELAND AND BRADLEY COPELAND to borrow money in the name of the undersigned from the Bank, to execute notes in the name of the undersigned evidencing the sums so borrowed, and agrees that the undersigned shall be bound on all such notes in the same manner and to the same extent as if the undersigned had personally executed such notes.

COLLECTIVE TRIAL EX. 153 (Application).

The Debtor also testified that she carried HCC checks in her purse and that she ran errands for Mr. Copeland, picking up supplies and paying vendors. Nine checks payable to suppliers and vendors, signed by the Debtor for the period of January 29, 1998, to February 12, 1998, were introduced into evidence. *See* TRIAL EX. 16; TRIAL EX. 17; TRIAL EX. 19; TRIAL EX. 20; TRIAL EX. 21; TRIAL EX. 22; TRIAL EX. 23.[20] The fact that the Debtor signed HCC checks is not, in and of itself, determinative. In her testimony, Natalie LaRose also acknowledged that she signed business checks during her employment at HCC from November 1997 until July 1999. According to her testimony, Ms. LaRose signed approximately forty-four checks during that twenty-month period, all with the express authority of Mr. Copeland.[21] However, in addition to vendor checks, the Plaintiffs introduced into evidence four payroll checks for HCC employees, dated February 13, 1998, March 13, 1998, June 5, 1998, and August 6, 1998, respectively, that were signed by the Debtor. *See* TRIAL EX. 18; TRIAL EX. 26; TRIAL EX. 36; TRIAL EX. 34. The Debtor acknowledged signing the payroll checks, stating that there were a couple of times when she was present at HCC, assisting during the busiest times of the year, and Mr. Copeland was too busy to sign the payroll checks, so the employ-

---

**20.** Two additional vendor checks were introduced, with dates of December 12, 1997, and June 5, 1998. *See* TRIAL EX. 14; TRIAL EX. 35. Several months of checks were not introduced into evidence, and in fact, the Debtor's testimony reflects that the above-referenced checks came from the January 1998 through May 1998 bank statements and that they represent only a fraction of the checks that the Debtor signed on the HCC checking account.

**21.** Ms. LaRose testified that she executed checks "Natalie LaRose for Brad Copeland" until the very end of her employment, when she merely signed her own name. Ms. LaRose was never added to the HCC checking account as a signatory.

ees asked her to sign them.[22] On the other hand, Ms. LaRose testified that she was not authorized to and thus never signed payroll checks.

More telling to the court, however, are the personal checks that both the Debtor and Mr. Copeland wrote out of the HCC business checking account. Checks were introduced into evidence showing that the Debtor and Mr. Copeland gave money to their church, paid daycare and other child-related expenses, and paid credit card and loan obligations out of the HCC checking account. *See* TRIAL EX. 14; TRIAL EX. 17; TRIAL EX. 18; TRIAL EX. 19; TRIAL EX. 20; TRIAL EX. 24; TRIAL EX. 26; TRIAL EX. 27; TRIAL EX. 28; TRIAL EX. 32; TRIAL EX. 33; TRIAL EX. 34; TRIAL EX. 36; TRIAL EX. 37; TRIAL EX. 38. The Debtor stated that because Mr. Copeland owned HCC, it was easier to just pay for necessities with business checks rather than have Mr. Copeland pay himself and then write the checks out of their personal account. Regardless of whether it was easier or more convenient for the Copelands, it is apparent to the court that monies coming into the Copelands' possession went into HCC, irrespective of the source, and their intermingling of personal and business funds satisfy the *Bass* definition of partners combining their "property or money" for the business relationship.

Second, it is evident to the court that the Debtor and Mr. Copeland combined their "labor, skill, and expertise" for the good of HCC. From the Debtor's testimony, as well as that of Ms. LaRose and the Plaintiffs, the court easily deduces that the Debtor did not spend the amount of time working at HCC's business premises that Mr. Copeland did. However, based upon this same testimony, the court concludes that it was not necessarily the quantity of time that the Debtor spent assisting Mr.

Copeland at and with HCC, but rather, it was the quality of that time that is determinative.

Ms. LaRose testified that when she first began working at HCC, the Debtor, along with Mr. Copeland, helped to train her. When asked about the Debtor's responsibilities at that time, Ms. LaRose testified that the Debtor sold products, booked orders, cleaned, set up areas of the store, and did general merchandising and retailing for HCC. Ms. LaRose stated that as she got more proficient, the Debtor's participation at HCC decreased, and eventually, Mr. Copeland's did also.

The Debtor acknowledged that when Mr. Copeland first started HCC, she assisted him but that prior to the sale of HCC's assets to the Plaintiffs, she spent little time at the store, assisting Mr. Copeland mostly during the holidays, which were their busiest times. The Debtor stated that her assistance mainly consisted of her running errands and folding boxes and that during the busiest times, others, including her parents, Mr. Copeland's parents, and members of their church, would also assist at the store. The Debtor testified that Mr. Copeland taught her, as well as some members of their Sunday School class, how to write on cakes. The Debtor denied, however, that she was ever involved in marketing for HCC. In fact, when questioned about her involvement with HCC at trial, the Debtor responded as follows:

Q: In fact, you just don't know anything about anything at all in relation to this business except folding boxes, do you?

A: That and writing names on cakes.

TRIAL TESTIMONY (Angela Copeland). Ms. LaRose confirmed that after she was fully

---

**22.** The Debtor testified that she never figured the payroll checks herself.

trained and the Debtor's presence at HCC decreased, the times when the Debtor was most likely to actually be in the store were during the holidays, and that Mr. Copeland's parents were also present at the store at those times. Ms. LaRose did not recall anyone from the Copelands' church coming in to assist.

Similarly, the Plaintiffs admitted that other than her initial telephone call to them regarding their interest in purchasing HCC's assets, they only spoke with the Debtor by telephone a couple of times prior to the Closing, at which the Debtor was present. Additionally, every time that the Plaintiffs went to HCC after-hours to train, only Mr. Copeland was available. However, the Plaintiffs were not surprised that they did not have more interaction with the Debtor during that time period because she was pregnant when she first contacted them and, in fact, delivered her baby during the negotiations for the sale of HCC's assets.

Conversely, there is also a plethora of evidence in direct contradiction to the Debtor's testimony that she was not a co-owner of HCC. First, there are two newspaper articles and one pictorial from the *Knoxville News–Sentinel* (the Newspaper) in which HCC is featured, ranging from May 1997 to June 1998. *See* TRIAL EX. 137; TRIAL EX. 138; TRIAL EX. 139. Each of these articles refers to the Debtor and Mr. Copeland as "co-owners" of HCC, and the Debtor's picture appears with two of the articles. Additionally, the Debtor admits to being interviewed for the second article, which ran in late January or early February 1998. *See* TRIAL EX. 137. The Debtor testified that these articles were incorrect, particularly the first one from May 1997. *See* TRIAL EX. 138. However, despite her contention that the articles contained errors, the Debtor testified that she never asked the Newspaper to retract

any of the erroneous statements because Mr. Copeland told her not to based upon the notion that it was free advertising, and if they asked for a correction, they might not get any more free advertising.

Based upon the amount of detail as to the history of HCC, the types of items sold, and personal information about the Copelands, it is difficult for the court to accept that both newspaper articles, written by two different reporters, had the same errors concerning co-ownership and duties of the Debtor and Mr. Copeland. Moreover, the pictorial consisted of three photographs, including two with the Debtor and Mr. Copeland dressed in what appears to be chef's attire, concerning their invitation to students to visit HCC in a Junior Achievement-related activity. The caption between these two photographs of the Copelands reads:

> Above, Brad and Angela Copeland, co-owners of Heavenly Cheesecakes and Chocolates, show a French vanilla cheesecake with fruit topping. They welcomed Bearden Elementary School second-graders into their business, right, to show them how it operates.

TRIAL EX. 139. This article was on display at HCC for the patrons to see.

In addition to the newspaper articles, the testimony of Carole Ireland also contradicts the Debtor's assertions. The Debtor testified in her deposition that she met with Ms. Ireland after Mr. Copeland was unable to keep an appointment that he had made to discuss Ms. Ireland's company, Creative On Call, creating an advertising brochure for HCC. *See* TRIAL EX. 162, page 73, line 3—line 18. To the contrary, Ms. Ireland testified that her first contact with HCC was through the Debtor whom she met at a Chamber of Commerce coffee in March 1997. Ms. Ireland testified that, at the time, it was the Debtor and not Mr. Copeland who wanted to discuss creating a

brochure for HCC. Ms. Ireland set up the HCC account under both the Debtor's and Mr. Copeland's names, based upon her understanding that they co-owned HCC. Ms. Ireland recalled meeting with the Debtor again in April 1997, after another Chamber of Commerce coffee, to discuss production of the brochure, and she also remembered a couple of telephone conversations with the Debtor in May 1997 regarding the brochure. The final approval and order for the brochure came from Mr. Copeland in September 1997, after Ms. Ireland had sent a black and white draft to the Copelands for review. Ms. Ireland stated that neither the Debtor nor Mr. Copeland indicated that the brochure had any material errors, so Creative On Call produced the brochure from the black and white draft. The brochure reads, in part:

> Heavenly Cheesecakes and Chocolates are the ultimate indulgence in good taste. Made fresh each day, these gourmet cheesecakes have been served to presidents, corporate executives, and satisfied diners worldwide.
>
> Now it's your turn to indulge. Experience our creamy French Vanilla cheesecake, winner of the East Tennessee Restaurant Association's A La Carte award, or perhaps you'd prefer the sparkling tartness of our popular Keylime cheesecake, the Tiramisu cheesecake, or any of our other different flavors.
>
> Locally owned and personally operated by Brad and Angela Copeland, Heavenly Cheesecakes and Chocolates has a café style bakery where you can place your special orders, or simply enjoy a slice of heavenly perfection in our shop.
>
> Visit us soon, won't you?

TRIAL EX. 163. Yet, once again, neither the Debtor nor Mr. Copeland asked Crea-tive On Call to fix the "error" that the Debtor was a co-owner of HCC.

Third, documents pertaining to the SBA Loan for Bradley and Angela Copeland through FTB, that the Debtor executed with Mr. Copeland (the SBA Loan Documents), were introduced into evidence and authenticated by Mitchell Adams, who is employed by FTB. *See* COLLECTIVE TRIAL EX. 154. Included among the SBA Loan Documents are (1) an Application; (2) a Note; (3) UCC–1 Filings; (4) a Business Plan; (5) Credit Reports; (6) a Pro Forma Balance Sheet; (7) a Personal Financial Statement; (8) a Lessor's Agreement; (9) a Loan Authorization and Agreement; (10) a Security Agreement; and (11) a Certification Form. *See* COLLECTIVE TRIAL EX. 154. The Debtor testified that she only signed the SBA Loan Documents because she was required to as Mr. Copeland's wife, but that it was a loan to him alone, for HCC, and so Mr. Copeland was the only one actually borrowing the money. The SBA Loan Documents, however, contain many references to both the Debtor and Mr. Copeland as co-borrowers.[23]

First, on the Application, the section entitled "Owners, Guarantors, and Co–Signers" stated that "Owners of 20% or more of business must guarantee the note. Lender must obtain personal credit reports on all owners, guarantors, and co-signers." COLLECTIVE TRIAL EX. 154 (Application for Business Loan). This section lists both Mr. Copeland and the Debtor. Pursuant to the Application, FTB obtained a credit report on both Mr. Copeland and the Debtor. *See* COLLECTIVE TRIAL EX. 154 (Credit Reports).

Next, as the Debtor acknowledges, she executed the Note as "Angela Copeland,

**23.** When asked if she read the SBA Loan Documents before signing them, the Debtor stated that she did not remember.

Wife." COLLECTIVE TRIAL EX. 154 (Note). However, pursuant to this Note, the Debtor executed a UCC–1 Financing Statement in favor of FTB, which was recorded with the Tennessee Secretary of State, giving FTB a perfected security interest in

any and all accounts, accounts receivables, contracts, contract rights, inventory, furnishings, fixtures, equipment, parts, accessories, general tangibles and intangibles, and any and all personal property of any kind whatsoever, emanating from or relating to the operation of Heavenly Cheesecakes & Chocolates, now in existence, wheresoever located, plus the proceeds therefrom.

COLLECTIVE TRIAL EX. 154 (Recorded UCC–1 Financing Statement for Angela Copeland). Identical UCC–1 Financing Statements were recorded as to Bradley Copeland, individually, and Heavenly Cheesecakes & Chocolates. *See* COLLECTIVE TRIAL EX. 154 (Recorded UCC–1 Financing Statements).

The next document in the SBA Loan Documents is a Business Plan (SBA Business Plan) for HCC, listing Mr. Copeland as the "Principal Owner." TRIAL EX. 154 (SBA Business Plan).[24] Additionally, on page 3 of the SBA Business Plan, under the title "Background & Current Situation," the following appears:

In November 1996, Brad and Angela Copeland began a sole proprietorship which bakes and distributes HEAVENLY CHEESECAKES & CHOCOLATES to test market the products and concept in Knoxville. Sample slices were offered at every opportunity.... Six months later, HEAVENLY CHEESECAKES & CHOCOLATES averages $850/week in sales. Six years ago, Brad's aunt, Pat King, and cousin, Phyllis Hudson, successfully began this "branded" bakery business concept in Florida.... Brad Copeland, principal owner, has brought this business concept to Knoxville with the specially developed recipes, as well as the invaluable experience of lessons learned from his aunt, in return, paying her a monthly rebate fee as a percentage of gross sales.

Brad and his wife, Angela, currently handle all aspects of the business at this time. Brad is employed full time at Lockheed Martin Energy Systems as an Industrial Hygiene Technician in the Oak Ridge National Laboratory.... Angela is a certified Dental Hygienist and works in tandem with Brad in all areas of their business, largely concentrating her efforts in product sales and marketing....

Currently all product is being produced in and distributed from a 380 square foot space, adjacent to their home in North Knoxville.... The demand has become so great that HCC is currently maintaining a list of customers and potential customers who wish to be notified by mail-out as soon as they know when and where they will be opening a retail outlet.

COLLECTIVE TRIAL EX. 154 (SBA Business Plan). Also, page 7 of the SBA Business Plan contains, under the section entitled "Advertising and Promotion Strategy," the following reference to the much maligned newspaper article that the Debtor claims contains many errors: "A recent article on HCC was featured in the Food Section of the Knoxville News[-]Sentinel which garnered a very positive response from the community." COLLECTIVE TRIAL EX. 154 (SBA Business Plan). Finally, on page 8

---

**24.** The SBA Business Plan differs from the Business Plan submitted as part of COLLECTIVE TRIAL EX. 147, discussed in section VI, part A, *infra.*

of the SBA Business Plan, the "Labor Requirements" section states, in part, that

Both Brad and Angela plan to continue employment in their present jobs after the retail location is opened. Each will be rescheduling hours in order to ensure proper coverage of shifts, but primarily to continue the direct marketing and research and development programs.

COLLECTIVE TRIAL EX. 154 (SBA Business Plan).

The final SBA Loan Document that refutes the Debtor's testimony is the Personal Financial Statement submitted by "Bradley E. & Angela R. Copeland." COLLECTIVE TRIAL EX. 154 (Personal Statement). This document, executed by both Mr. Copeland and the Debtor on July 26, 1997, references their Position or Occupation as "Owner" and lists the Business Name of "Heavenly Cheesecakes & Chocolates." COLLECTIVE TRIAL EX. 154 (Personal Statement).

Fourth, the Debtor executed the Closing Documents for the sale of HCC's assets as "Angela Copeland, d/b/a Heavenly Cheesecakes & Chocolates." The Debtor testified that she did not read the documents, that she simply signed where Mr. Copeland instructed her to sign. However, when coupled with all of the other instances discussed herein, the Debtor's testimony regarding the Closing Documents loses its persuasiveness. Moreover, attached to two of the Closing Documents, the Confidentiality and Non–Competition Agreement and the Bill of Sale, is an Exhibit A that references an Operations Training Manual for Bakery Business "created exclusively by Brad and/or Angela Copeland"

and the exclusive rights to forty-one recipes "created exclusively by Brad and/or Angela Copeland." [25] TRIAL EX. 9; TRIAL EX. 10.

Fifth, documents found by the Plaintiffs after they took possession of the business premises indicate that the Debtor played a larger role at HCC than she testified to. First, the Plaintiffs discovered previous HCC cake contracts showing "paid in full" notations with the Debtor's initials. See TRIAL EX. 132; TRIAL EX. 133; TRIAL EX. 134; TRIAL EX. 135. Additionally, on one of these contracts appeared the notation "Angela—Wedding Coordinator; Chef—Brad." TRIAL EX. 132. The Debtor admitted that this notation was her handwriting. TRIAL EX. 162, page 68, lines 9 through 16.[26]

Also produced was a letter addressed to Rabbi Levine from Angela Copeland listing the ingredients that HCC used in its products. TRIAL EX. 126. The Debtor testified that Mr. Copeland asked her to write this letter because she is Jewish, and although she did not type the letter or actually send it, she did sign it on behalf of HCC. See TRIAL EX. 162, page 62, line 23 through page 63, line 26. Similarly, a letter dated January 12, 1998, addressed to "Bride–to–Be" detailing HCC's general price list was sent out under the Debtor's name. See TRIAL EX. 127. The Debtor testified that the signature on that letter actually belonged to Mr. Copeland, but she acknowledged that her name appears on the signature line. The Plaintiffs also introduced copies of two unsigned letters typed on HCC stationery addressed "Dear Brenda" and "Dear Don" with the Debt-

---

**25.** This manual is also specifically discussed on the first page of the Confidentiality Agreement.

**26.** Additional documents evidencing that the Debtor acted in the capacity of "wedding coordinator" included a handwritten note dated June 9 regarding the Shular wedding and a typewritten note regarding the Watson wedding. See TRIAL EX. 133; TRIAL EX. 134.

or's name in the capacity of "Vice President, Sales and Marketing" typed on one, and the Debtor's name followed by "Sales and Marketing" typed on the other. Trial Ex. 128; Trial Ex. 131. The Debtor testified that she knew these people and that sometimes people assisting Mr. Copeland would send out letters with her name to people that she knew. *See* Trial Ex. 162, page 64, line 13 through page 65, line 6; page 67, line 23 through page 68, line 8.[27]

Lastly, the Plaintiffs introduced into evidence documents relating to a donation made to the East Tennessee Heart Gala. *See* Trial Ex. 129. The donation form itself states that a gift certificate for a free cheesecake was being "Donated by: Heavenly Cheesecakes & Chocolates." Trial Ex. 129. The "Name as it will appear in brochure" also states that HCC donated the item. Trial Ex. 129. However, at her deposition, the Debtor testified that she personally donated the item, but that she was not going to make it herself when Mr. Copeland could. *See* Trial Ex. 162, page 65, line 7 through page 67, line 13. Additionally, when asked about this donation at trial, the Debtor testified as follows:

Q: East Tennessee Heart Gala, Exhibit 129, is that your signature?

A: Yes, it is.

Q: And this is a donation form for the East Tennessee Heart Gala?

A: Yes, it is.

Q: And it's not for you personally, it's for the business, isn't it?

A: This was donated by me. The name Heavenly Cheesecakes & Chocolates is the name of the cheesecake that I had rights to by Phyllis. This is why that [sic] she gave me that [sic] is be-

cause if I needed to donate anything to church that I could go by the shop and not have to pay Brad. And attached there is a—it entitles the recipient to go by the shop instead of me taking it to them.

Q: And you don't have that agreement with Phyllis with you here today?

A: That's correct. We've previously stated that.

Q: And how is the public supposed to know when you're acting for Brad's Heavenly Cheesecakes & Chocolates and when you're acting for Angela's Heavenly Cheesecakes & Chocolates?

A: There is no Angela's Heavenly Cheesecakes & Chocolates. There's only friends who I know.

Q: Well, on this document isn't the name as it appears on their donation brochure Heavenly Cheesecakes & Chocolates?

A: That's the name of the cake.

Q: And isn't that also the entity that donated it, donated by Heavenly Cheesecakes & Chocolates?

A: Yes.

Trial Testimony (Angela Copeland).

The Debtor claimed never to have seen some of these documents prior to her deposition or trial; however, given her own handwritten notations on many documents, it is difficult for the court to accept that the Debtor was unaware that these documents, with her name on them, were being sent out without her knowledge and approval. It is also implausible that all of the foregoing documents, some of which were prepared by the Debtor and Mr.

---

**27.** At trial, the Debtor testified that she had "never even seen this letter until now" and that it "was made up by Brad's people that was [sic] helping him out, but they knew I knew her." Trial Testimony (Angela Cope-

land). Interestingly, the first newspaper article, which the Debtor claimed is predominantly erroneous, states that the Debtor "likes the marketing end of the business." Trial Ex. 138.

Copeland, or at their direction, are erroneous.

Based upon the totality of the proof presented, the court is persuaded that the actions of the Debtor and Mr. Copeland sufficiently provide a basis for determining that they carried on as co-owners of and partners in HCC, combining their money, labor, skill, and experience. They held themselves out to the public as co-owners, despite the Debtor's assertions at trial that she never intended to be a co-owner of HCC. As stated by the Tennessee Court of Appeals, the parties did not have to actually intend to form a partnership or know that their actions would result in a partnership. *See Messer Griesheim Indus., Inc.,* 45 S.W.3d at 605. The existence of their partnership can easily be implied from their actions. The first prong of the *Ledford* test is met.

**B**

Having found that a partnership existed, the *Ledford* test next requires that Mr. Copeland must have committed fraud while acting on behalf of the partnership, HCC, in the ordinary course of business. Therefore, the first question is whether Mr. Copeland, in fact, committed fraud and, if so, whether it occurred while he was acting in the ordinary course of business.

Under Tennessee law, "[w]hen a party intentionally misrepresents a material fact or produces a false impression in order to mislead another or to obtain an unfair advantage over him, there is a positive fraud." *Brown v. Birman Managed Care, Inc.,* 42 S.W.3d 62, 66–67 (Tenn. 2001) (quoting *First Nat'l Bank v. Brooks Farms,* 821 S.W.2d 925, 927 (Tenn.1991)).

As to whether Mr. Copeland committed fraud, the Knox County Chancery Court Judgment is clear. The Judgment itself states "that Brad Copeland intentionally provided false and material information to the plaintiffs, upon which the Plaintiff's [sic] relied to their detriment." TRIAL EX. 141 (Judgment). This Judgment was drafted pursuant to the Court's [Memorandum] Opinion, delivered by the Chancellor from the bench on October 4, 2001. The Opinion states, in part:

> I believe that there was a breach of contract and that the defendant did intentionally provide false information upon which the plaintiffs under all the circumstance [sic] of the case reasonably relied to their detriment in purchasing the business.

TRIAL EX. 141 (Court's Opinion). The Knox County Chancery Court Judgment is clear on the issue of Mr. Copeland's fraud against the Plaintiffs. Thus, the court must now determine whether this fraud occurred during the ordinary course of business.

"[A] transaction occurs in the ordinary course when there is a showing that the transaction is the sort occurring in the day-to-day operation of the debtor's business, or businesses like it." *United States ex rel. Harrison v. Estate of Deutscher (In re H & S Transp. Co., Inc.),* 115 B.R. 592, 598 (M.D.Tenn.1990); *see also* BLACK'S LAW DICTIONARY 1098 (6th ed.1994) (defining ordinary course of business as "[t]he transaction of business according to the common usages and customs of the commercial world generally or of the particular community or (in some cases) of the particular individual whose acts are under consideration.... In general, any matter which transpires as a matter of normal and incidental daily customs and practices in business."). Generally, the sale of a business is not considered a transaction within the ordinary course of business. *See, e.g., Wolf Creek Collieries Co. v. GEX Ky., Inc.,*

127 B.R. 374, 380 n. 2 (N.D.Ohio 1991) (in the context of a chapter 11 case, "the process of selling the principal assets of a business is not one within the ordinary course of business").

Mr. Copeland's fraud obviously occurred on behalf of HCC. The false statements and misrepresentations directly involved HCC's assets, albeit to effectuate the sale thereof. Traditionally, the sale of a business's assets, other than regular inventory, does not occur during the ordinary course of business. Clearly, the Closing Documents were executed in connection with the sale of HCC's assets to the Plaintiffs. Accordingly, the court must conclude that Mr. Copeland's fraud did not occur in the ordinary course of business and, thus, does not satisfy the second prong of the *Ledford* test.[28]

### C

Because the second prong of the *Ledford* test was not satisfied, it is inconsequential whether the Debtor and Mr. Copeland shared in the profits of the sale of HCC's assets to the Plaintiffs; i.e., the "monetary benefits" of Mr. Copeland's fraud. However, the court is convinced, based upon the evidence cited in section IV, part A, subsection 1, *supra*, used to determine that the Debtor received a benefit pursuant to the *Rembert* test, that the Debtor and Mr. Copeland shared in the proceeds received from the Plaintiffs in

their purchase of HCC's assets. Nevertheless, because all three prongs of the *Ledford* test are not satisfied, Mr. Copeland's fraud cannot be imputed to the Debtor for the purposes of nondischargeability under § 523(a)(2)(A).

### D

The Plaintiffs have not established the necessary requirements for nondischargeability under § 523(a)(2)(A) as to the Debtor's own conduct, nor have they established that Mr. Copeland's fraud may be imputed upon the Debtor. Accordingly, § 523(a)(2)(A) does not preclude the discharge of any debt subsequently owed by the Debtor to the Plaintiffs resulting from the sale of HCC's assets.

### VI

■ Alternatively, the Plaintiffs seek a determination that nondischargeability is appropriate under § 523(a)(2)(B). To satisfy § 523(a)(2)(B), the creditor must prove "that the debt was obtained by the use of a statement (1) in writing; (2) that [was] materially false; (3) respecting the debtor's or an insider's financial condition; (4) on which the creditor to whom the debtor is liable for money, property, services or credit reasonably relied; that the debtor caused to be made or published with intent to deceive." 4 COLLIER ON BANKRUPTCY ¶ 523.08[2] (Lawrence P. King ed., 15th ed.

---

28. The *Ledford* decision affirmed the decision by the District Court for the Middle District of Tennessee, which applied Tennessee law to the question of imputation. *See BancBoston Mortgage Corp. v. Ledford (In re Ledford),* 127 B.R. 175 (M.D.Tenn.1991). The district court held that imputed liability was mandated by Tennessee Code Annotated section 61–1–112, adopting the Uniform Partnership Act, which provided:

Wrongful acts of partners.—Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership, or with the authority of his copartners, loss of injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act.

*Id.* at 184–85 (quoting TENN. CODE ANN. § 61–1–112 (1989)). This statute has been superceded by Tennessee's adoption of the Revised Uniform Partnership Act in 2001. *See* TENN. CODE ANN. Title 61.

rev.2002) (citing *Ins. Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108 (3d Cir.1995)).

## A

■ Section 523(a)(2)(B) does not apply to oral statements, only to those actually reduced to writing and produced by the debtor to the creditor. *See Schneiderman v. Bogdanovich (In re Bogdanovich)*, 292 F.3d 104, 111 (2d Cir.2002). The writing requirement is fulfilled by producing a written statement, "signed, adopted or used by the debtor," *Insouth Bank v. Michael (In re Michael)*, 265 B.R. 593, 598 (Bankr.W.D.Tenn.2001), and it encompasses the use of documents actually prepared by the debtor as well as documents prepared by another. *See Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997).

■ As previously discussed, the Debtor and Mr. Copeland executed an Asset Purchase Agreement, a Confidentiality and Non–Competition Agreement, a Bill of Sale, a Closing Statement, and a Sales Tax Affidavit in order to effectuate the sale of HCC's assets to the Plaintiffs. In addition to these Closing Documents, Mr. Copeland also submitted several other documents to the Plaintiffs during the negotiations for the sale of HCC's assets. First, Mr. Copeland provided to the Plaintiffs a General Prospectus, which included (1) a Balance Sheet as of March 31, 1999; (2) monthly sales figures for 1998; (3) monthly sales figures for 1999; (4) a Profit & Loss Statement dated January 1, 1997, through December 31, 1997; (5) a list of Key Purveyors/Suppliers; and (6) an equipment list. *See* COLLECTIVE TRIAL EX. 146.

Mr. Copeland also presented to the Plaintiffs copies of documents relating to a prior offer to purchase HCC's assets by Dr. Francis Roy (the Roy Offer Documents). *See* COLLECTIVE TRIAL EX. 147. These documents included (1) a letter dated June 15, 1999, from Francis Roy, one of the prior prospective purchasers, to SunTrust Bank regarding the transmittal of the subsequent documents; (2) a letter of intent dated May 6, 1999, between Dr. Thomas Scandlyn and Mr. Copeland; (3) a Business Plan for Heavenly Cheesecakes & Chocolates (the Roy Business Plan); (4) a Profit & Loss Statement dated January 1, 1999, through May 18, 1999; (5) a Profit & Loss Statement dated January 1, 1998, through December 31, 1998; (6) a Schedule C Profit or Loss from Business tax return for 1997; (7) a Schedule C Profit or Loss from Business tax return for 1998; (8) a statement of Accounts Receivable and Accounts Payable as of May 18, 1999; (9) a May 17, 1999 letter from About Face Properties, LLC guaranteeing approval of sub-lease of Business premises; (10) a blank Sub–Lease; (11) a blank Guaranty; and (12) a blank Key Release Form. COLLECTIVE TRIAL EX. 147.

Additionally, deposit slips for March 1999, a fax allegedly from the Tennessee Department of Revenue regarding sales tax payments,[29] and the Copelands' 1998 income tax return were provided to the Plaintiffs by Mr. Copeland. *See* TRIAL EX. 148; TRIAL EX. 150; TRIAL EX. 3.

Clearly, all of the documentation upon which the Plaintiffs submitted as evidence of false statements falls within the writing requirement. Several of these documents, including the false March 1999 deposit record, the false Department of Revenue fax, the Copelands' false tax returns, the Copelands' actual tax returns, and the General Prospectus, were actually prepared by or for the Copelands. Additionally, even

---

**29.** It is undisputed that the author of the fax was Mr. Copeland and that the information contained therein regarding HCC's sales tax payments was false.

though the Closing Documents were prepared by the Plaintiffs' attorney, they were subsequently signed, and therefore, adopted by the Copelands, satisfying the § 523(a)(2)(B) writing requirement.

## B

 For the purposes of § 523(a)(2)(B)(i), a statement is materially false if it "contains an important or substantial untruth. The measuring stick of material falsity is whether the [creditor] would have made the loan if the debtor's true financial condition had been known." *First Nat'l Bank v. Sansom (In re Sansom)*, 224 B.R. 49, 54 (Bankr.M.D.Tenn. 1998) (quoting *Fleming Cos. v. Eckert (In re Eckert)*, 221 B.R. 40, 44 (Bankr.S.D.Fla. 1998)); *see also Michael*, 265 B.R. at 598 ("A statement is materially false if the information offers a substantially untruthful picture of the financial condition of the debtor that affects the creditor's decision to extend credit."). Additionally, a debtor's "failure to list, [or] concealment or understatement of assets or liabilities is ordinarily a misstatement considered 'material.'" *Sansom*, 224 B.R. at 54; *see also AmSouth Fin. Corp. v. Warner (In re Warner)*, 169 B.R. 155, 159 (Bankr. W.D.Tenn.1994).

 The General Prospectus included several documents containing false statements, such as the balance sheets, monthly sales figures, and profit/loss statement. *See* COLLECTIVE TRIAL Ex. 146. Additionally, the General Prospectus makes the following statements: "Since November of 1997, gross sales have exceeded $200K.... Assets include both full scale baking equipment and retail area equipment totaling approximately $123K." COLLECTIVE TRIAL Ex. 146. As later discovered by the Plaintiffs, these representations were false in that the profits were grossly inflated, as was the value of the equipment.

Similarly, many of the Roy Offer Documents were later discovered to contain false statements. *See* COLLECTIVE TRIAL Ex. 147. Specifically, the Profit & Loss Statement for 1998 evidences a Total Income of $91,438.75, which was later admitted to be erroneous, as was the Schedule C tax return for 1998, evidencing a net profit for that year of $84,142.00. *Compare* COLLECTIVE TRIAL Ex. 147 (Schedule C for 1998) *with* COLLECTIVE TRIAL Ex. 4 (Schedule C for 1998 actually filed with IRS) *and* COLLECTIVE TRIAL Ex. 5 (Amended Schedule C for 1998 actually filed with IRS).

Likewise, the March 1999 deposit records, the alleged Department of Revenue fax, and the Copelands' 1998 income tax return provided to the Plaintiffs by Mr. Copeland were fabricated by Mr. Copeland. *See* TRIAL Ex. 148; TRIAL Ex. 150; TRIAL Ex. 3. Even though the Debtor did not actually prepare these documents, she testified that it was her signature on the false tax return. *See* TRIAL Ex. 3.

As previously discussed in section IV, part A, subsection 2, *supra*, the Closing Documents contained false representations. Most significantly, the Debtor and Mr. Copeland executed a Sales Tax Affidavit at the Closing. *See* TRIAL Ex. 11. The Sales Tax Affidavit states:

> The undersigned, BRAD COPELAND and ANGELA COPELAND d/b/a HEAVENLY CHEESECAKES AND CHOCOLATES, on oath states [sic]:
>
> 1. That Brad Copeland and Angela Copeland d/b/a Heavenly Cheesecakes and Chocolates (herein "Sellers") are the Sellers under an Asset Purchase Agreement for the sale of assets dated as of July *31st*, 1999 between the Sellers and Kevin C. Haney, and Marilyn Sue Melhorn (the "Buyers"), as Buyers;

2. That this Affidavit is made pursuant to the terms and provisions of Tennessee Code Annotated § 67–6–513 and is furnished to the Buyers in connection with the sale and transfer described to and referred to in the above-mentioned Agreement;

3. That as of the date hereof, the Sellers' liability to the Tennessee Department of Revenue for the payment of sales tax amounts to *$0* and that the Sellers will promptly file a final State and Local Sales and Use Tax Return with the Tennessee Department of Revenue.

TRIAL Ex. 11. Again, these statements were false in that sales taxes had not been paid. In fact, pursuant to a letter dated February 11, 2000, from the Central Files Unit of the Tennessee Department of Revenue, HCC's account with the Tennessee Department of Revenue was "closed August 31, 1998," evidencing that sales taxes were delinquent from that date. TRIAL Ex. 151.[30]

A large majority of the documents provided to the Plaintiffs during the pendency of the negotiations for the sale of HCC's assets and during the Closing of the sale itself were materially false. First, the General Prospectus and supporting documentation supplied to the Plaintiffs by Mr. Copeland contained grossly inflated profits and equipment values. *See* COLLECTIVE TRIAL Ex. 146. Second, the Roy Offer Documents, given to the Plaintiffs by Mr. Copeland, contained similar misstatements. *See* COLLECTIVE TRIAL Ex. 147. The March 1999 deposit record, the Department of Revenue fax, and the tax return were all fabricated by Mr. Copeland. *See* TRIAL Ex. 148; TRIAL Ex. 150; TRIAL Ex. 3. The Asset Purchase Agreement, executed by the Debtor and Mr. Copeland, contained many false statements as to what was actually being transferred. *See* TRIAL Ex. 8. Finally, the Sales Tax Affidavit, signed by both the Debtor and Mr. Copeland and indicating that all sales taxes for HCC were current, was untrue. The material misrepresentation requirement of § 523(a)(2)(B)(i) has been satisfied.

**C**

 Section 523(a)(2)(B)(ii) requires that the writing presented to the creditor makes representations regarding either the debtor's financial status or an insider's financial status. Such financial-type documents relating to a debtor's financial condition include "balance sheets, income statements, statements of changes in financial position, or income and debt statements that provide what may be described as the debtor or insider's net worth, overall financial health, or equation of assets and liabilities." *Skull Valley Band of Goshute Indians v. Chivers (In re Chivers)*, 275 B.R. 606, 615 (Bankr.D.Utah 2002); *see also Armbrustmacher v. Redburn (In re Redburn)*, 202 B.R. 917, 927–28 (Bankr. W.D.Mich.1996) (finding statements regarding ownership of property "free and clear" respected the debtor's financial condition); *Chios v. Klein (In re Klein)*, 58 B.R. 397, 398 (Bankr.E.D.Pa.1986) (finding inflated inventory lists were statements reflecting the debtor's financial condition). Tax returns have also been considered financial documents for the purpose of this subsection. *See Republic Bank v. Fineberg (In re Fineberg)*, 170 B.R. 276, 278–79 (E.D.Pa.1994); *Fairfax State Sav. Bank v. McCleary (In re McCleary)*, 284 B.R. 876, 884 (Bankr.D.Iowa 2002).

 One of the documents provided to the Plaintiffs was the false individual tax return for 1998 for the Copelands. *See*

---

**30.** This letter was obtained during discovery in the Knox County Chancery Court Lawsuit.

TRIAL EX. 3. This document was signed by the Debtor and Mr. Copeland and reflects an income from HCC of $62,331.00. *See* TRIAL EX. 3. The remaining documents provided to the Plaintiffs in connection with the transaction with the Copelands concerned the financial status of HCC. However, not all of these documents satisfy the requirement that they must be financial-type documents. In the court's opinion, with the exception of the Sales Tax Affidavit, the Closing Documents fall outside the scope of § 523(a)(2)(B)(ii). On the other hand, the Sales Tax Affidavit specifically deals with whether or not taxes have been paid. The payment of sales taxes was of financial relevance as to the value of HCC.

Likewise, the General Prospectus, which contained a balance sheet, monthly sales figures, and a profit/loss statement, along with an express statement regarding HCC's gross sales, clearly falls within the purview of documents representing financial status. *See* COLLECTIVE TRIAL EX. 146. Additionally, the Roy Offer Documents included a letter of intent referencing a purchase price of $205,000.00, a business plan, profit/loss statements, an income tax Schedule C showing profits/losses for 1997 and an income tax Schedule C showing profits/losses for 1998, and a statement of accounts receivable and accounts payable. *See* COLLECTIVE TRIAL EX. 147. Again, these documents reflect the financial condition of HCC.

With the exception of the Copelands' tax returns, the above-referenced documents do not purport to represent the Debtor's individual financial condition. However, § 523(a)(2)(B)(ii) also includes the financial condition of an insider, which the Bankruptcy Code defines as

(A) if the debtor is an individual—

(i) relative of the debtor or of a general partner of the debtor;

(ii) partnership in which the debtor is a general partner;

(iii) general partner of the debtor; or

(iv) corporation of which the debtor is a director, officer, or person in control[.]

11 U.S.C.A. § 101(31) (West 1993). The court has already determined that the Debtor and Mr. Copeland operated HCC as a partnership under Tennessee law. Hence, the above-referenced financial-type documents representing the financial condition of HCC fall within the scope of § 523(a)(2)(B)(ii) as an insider of the Debtor.[31]

**D**

In contrast to § 523(a)(2)(A)'s "justifiable reliance" standard, § 523(a)(2)(B) requires a "reasonable reliance" by the creditor. *Shaw Steel, Inc. v. Morris (In re Morris)*, 223 F.3d 548, 552 (7th Cir.2000) (citing *Mans*, 116 S.Ct. at 442–43). "Reasonable reliance" is determined on a case by case basis, judged in light of the totality of the circumstances after an examination of all facts and circumstances. *See Morris*, 223 F.3d at 553; *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir.1993); *Phillips v. Coman (In re Phillips)*, 804 F.2d 930, 933 (6th Cir.1986). The reasonableness standard "is intended as an obstacle only for creditors acting in bad faith." *Nat'l Union Fire Ins. v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 305 (2d Cir.1996) (quoting *Hong Kong Deposit & Guar. Co. Ltd. v. Shaheen (In re Shaheen)*, 111 B.R.

---

**31.** Likewise, documents evidencing Mr. Copeland's financial status would fall within this subsection.

48, 53 (S.D.N.Y.1990)). "While ... the concept of reasonable reliance does not generally require creditors to conduct an investigation prior to entering into agreements with prospective debtors, such a precaution could be the ordinarily prudent choice ...." *Morris*, 223 F.3d at 554. Factors to be considered by the court include "whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any 'red flags' that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations." *Coston*, 991 F.2d at 261.

■ As determined in section IV, part C, *supra*, it is beyond question that the Plaintiffs actually relied upon the documents provided to them by Mr. Copeland in their decision to purchase HCC's assets. Likewise, having already found that the Plaintiffs' reliance on these documents was justifiable, as required by § 523(a)(2)(A), the court also finds that their reliance was reasonable. First, the Plaintiffs testified that they would not have contracted to purchase HCC's assets if they had known that the profits represented during the negotiations were inflated.

Additionally, although they were not required to, after receiving the General Prospectus and the Roy Offer Documents from Mr. Copeland, the Plaintiffs contacted a certified public accountant who reviewed the documents and advised them to obtain additional information from Mr. Copeland regarding HCC's financial condition and the payment of sales taxes. Following their accountant's advice, the Plaintiffs requested and received from Mr. Copeland the false Department of Revenue fax and the false deposit record for March 1999. Additionally, at some point, the Plaintiffs received the false income tax return evidencing a profit from HCC of $62,331.00.

There is no proof whatsoever that the Plaintiffs acted in bad faith. No "red flags" appear to have been present, whereby the Plaintiffs should have been alerted to Mr. Copeland's fraud in presenting them with bogus documentation. In fact, any such "red flags" would reasonably have been dispelled once Mr. Copeland provided them with the additional information requested at the suggestion of their accountant. It is entirely reasonable that the Plaintiffs would rely upon copies of tax returns, a business plan, profit/loss statements, deposit records, and a fax indicating that it had been sent by the Department of Revenue. Accordingly, the court is convinced that the Plaintiffs' reliance upon the sham documents provided in connection with their purchase of HCC's assets was reasonable, satisfying § 523(a)(2)(B)(iii).

### E

■ Subsection (B)(iv) has two integral parts, first, that the debtor created the false statements, had the statements created, or allowed the statements to be "published," and second, that the debtor intended to deceive by producing the statements. "Publish" is defined as "[t]o make public; to circulate; to make known to people in general. To issue; to put into circulation.... To declare or assert, directly or indirectly, by words or actions, that a forged instrument is genuine." BLACK'S LAW DICTIONARY 1233 (6th ed.1994). The debtor may supply the creditor with the statements directly, or the creditor may obtain them indirectly from another source. 4 COLLIER ON BANKRUPTCY ¶ 523.08[1][e][i] (Lawrence P. King ed., 15th ed. rev.2002).

As with § 523(a)(2)(A), intent to deceive is a subjective measure that can be proved by a debtor's actions. *See Rembert*, 141 F.3d at 281; *McCoy*, 269 B.R. at 199. In the Sixth Circuit, "[§ ] 523(a)(2)(B)(iv) is met if a debtor is reckless when submitting financial statements that he knows are not true, not only if the debtor possesses a subjective intent to deceive." *Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85, 90 (6th Cir.1993); *see also Posillico v. Bratcher (In re Bratcher)*, 281 B.R. 753, 761 (Bankr. M.D.Fla.2002) ("The knowledge element is satisfied if a debtor's representation was known to be false or was recklessly made without knowing whether it was true or false."). Ergo, "gross recklessness is sufficient to establish an intent to deceive." *Bank One, Lexington, N.A. v. Woolum (In re Woolum)*, 979 F.2d 71, 73 (6th Cir.1992). "Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inference of intent [to deceive]." *Norris v. First Nat'l Bank (In re Norris)*, 70 F.3d 27, 30 n. 12 (5th Cir.1995) (quoting *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 305 (11th Cir.1994) (citations omitted)).

With regards to the first prong of § 523(a)(2)(B)(iv), the language of the statute unambiguously states that the debtor must cause the false financial documents to be made or published. *See* § 523(a)(2)(B)(iv). In other words, as it relates to this case, to satisfy this prong, the Plaintiffs must prove that the documents upon which they reasonably relied, i.e., the General Prospectus, the Roy Offer Documents, the false Department of Revenue fax, the false tax return for 1998, the false March 1999 deposit record, and the Sales Tax Affidavit, were either produced by the Debtor, produced for the Debtor, or requested by the Debtor.

The proof establishes that it was Mr. Copeland, and not the Debtor, who either produced the documents, had them produced, or allowed the production of the General Prospectus, the Roy Offer Documents, the false Department of Revenue fax, and the false March 1999 deposit record. In fact, the Plaintiffs have presented no evidence that the Debtor, herself, had any role whatsoever in the production of these documents. With the exception of a couple of telephone calls and her attendance at the Closing, the Plaintiffs dealt exclusively with Mr. Copeland during the negotiations for the sale of HCC's assets. Mr. Copeland was the person from whom the Plaintiffs both requested and received additional documentation regarding HCC's financial status.

On the other hand, the Debtor signed both the false tax return and the Sales Tax Affidavit. By doing so, she asserted by her actions that the representations contained therein were accurate. These documents were put into circulation and made known to the Plaintiffs prior to and at the Closing. Admittedly, the Debtor did not read these documents prior to signing them. In fact, when asked about her signature on the false tax return, the Debtor stated that she has never read a tax return before signing it, that if Mr. Copeland tells her to sign a document, she signs it, and that she is not obligated to anyone else as to the contents of any documents that she signs. Similarly, when questioned at trial about signing the false Sales Tax Affidavit, the Debtor testified that she did not read the Sales Tax Affidavit prior to executing it, did not pay attention to what it said, that her mind "never addressed a care." Instead, the Debtor stated that she simply signed all of the Closing Documents, including the Sales Tax Affidavit, based upon Mr. Copeland's request. Nevertheless, both the false 1998 tax return and the

Sales Tax Affidavit contained material information upon which the Plaintiffs relied to their detriment. The court determines that the Debtor, personally, caused the false tax return for 1998 and the Sales Tax Affidavit to be published, satisfying the first prong of § 523(a)(2)(B)(iv).

As to the second prong of § 523(a)(2)(B)(iv), the court reiterates that the Plaintiffs have not established that the Debtor actually intended to deceive them by signing and releasing the tax return and the Sales Tax Affidavit. However, under § 523(a)(2)(B), "[a]ctual knowledge of falsity and conscious intent to deceive are not necessary, intent may be inferred where the debtor made no effort to verify facts stated and had no reasonable grounds to believe that the facts were correct." *Warner*, 169 B.R. at 162. The court must focus on "whether the surrounding circumstances or the debtor's actions 'appear so inconsistent with [her] self-serving statement [that she lacked intent] that the proof leads the court to disbelieve the debtor.'" *Palmacci*, 121 F.3d at 789 (quoting *Heinold Commodities & Sec., Inc. v. Hunt (In re Hunt)*, 30 B.R. 425, 441 (M.D.Tenn.1983)).

In addition to her own actions constituting intent to deceive, the Plaintiffs contend that the Debtor was aware that representations made by Mr. Copeland during the Closing concerning HCC's worth were false, and yet, she remained silent, allowing the Closing to proceed. In her defense, the Debtor claimed to be ignorant, denying that she knew anything about HCC's finances, testifying at trial that she had nothing whatsoever to do with either her family's personal finances or HCC's finances. However, as previously discussed, the Debtor has given inconsistent testimony regarding what she knew as to both her household finances and those of HCC. Additionally, the Plaintiffs

testified that the parties discussed the Sales Tax Affidavit, in particular, prior to the Copelands executing it at the Closing. Whether it was actually discussed in front of the Debtor or not, she admitted to signing the Sales Tax Affidavit without reading it and without regard for its content. However, the fact that the Debtor did not review the Sales Tax Affidavit prior to executing and submitting it to the Plaintiffs "does not aid [her cause], instead it illustrates [her] indifference to [the Plaintiffs'] reliance on [her] representations." *Walter E. Heller & Co. v. Byrd (In re Byrd)*, 41 B.R. 555, 564 (Bankr. E.D.Tenn.1984). As stated by the Fourth Circuit,

> [a] wife who allows her husband to do business in her name and signs without question any sort of paper that he presents to her is not entitled to a discharge in bankruptcy merely because she has relied upon him where she has signed a statement as to her financial condition with "reckless indifference to the actual facts, without examining the available source of knowledge which lay at hand, and with no reasonable ground to believe that it was in fact correct."

*David v. Annapolis Banking & Trust Co.*, 209 F.2d 343, 344 (4th Cir.1953) (citing *Morimura, Arai & Co. v. Taback*, 279 U.S. 24, 49 S.Ct. 212, 215, 73 L.Ed. 586 (1929)); *see also Steinberg v. Creswell & Co., Inc. (In re Halls Trading Post, Inc.)*, 15 B.R. 781, 784 (Bankr.E.D.Tenn.1981) ("[O]ne having the ability and opportunity to inform [herself] of the contents of a writing before [she] executes it will not be allowed to avoid the effect of it by showing that [she] was ignorant of its contents or that [she] failed to read it.") (quoting *Evans v. Tillett*, 545 S.W.2d 8, 11 (Tenn.Ct.App. 1976)).

Along those lines, the court is once again concerned by the Debtor's inconsistent tes-

timony. At trial, the Debtor was questioned about her obligation to FTB on the SBA Loan Documents that she and Mr. Copeland executed and she responded as follows:

Q: I've handed you a three-page note [that is part of Collective Trial Ex. 154]. Would you please look at the last page?

A: Yes.

Q: Is that your signature?

A: Yes, sir.

Q: And that's your signature on the note obligating yourself to First Tennessee Bank?

A: Yes.

Q: And you have no doubt that if the note wasn't paid, they could sue you to collect their loss?

A: No, sir. I didn't know that. All I know is my husband said on my business they require the wife to sign.

Q: Well, what did you think the liability of anyone was for signing a promissory note with a bank?

A: The truth is I do not know. If my husband asked me to sign something, I did.

Q: So you have no clue what it means to sign a promise to pay a bank back money?

A: That he would do it because it said that he was the one that was actually borrowing the money. They didn't borrow it to me [sic]. I didn't borrow it from them and under my name it just says wife.

Q: So why in the world are you signing this document?

A: Because my husband asked me to.

Q: What is the commercial purpose of the bank having you sign this document if you have nothing to do with the transaction?

A: I don't know that.

Q: You undertook student loans with First Tennessee to finance your dental hygiene education; did you not?

A: Yes, I did.

Q: And what did you think it meant when you signed those promissory notes to pay back the money you had borrowed?

A: Well, on those promissory notes, they were loaning the money to me, so that way I knew that I needed to pay them back. On this promissory note, they're loaning the money to Brad and all it says under my name is wife.

Q: So your experience in life is signing a note does not obligate you if someone else is the primary person who wants the money?

A: My experience is that to whom the person is addressed that is borrowing the money, it is their responsibility to pay it back; in the student loan, that was me; in this document, that was not me, that was my husband.

Q: Did you read this note, do you recall, before you signed it?

A: I don't recall.

TRIAL TESTIMONY (Angela Copeland).

Similarly, at trial, when asked who managed the household finances, paid the household bills, and maintained the household bank statements, the Debtor testified categorically that Mr. Copeland did, stating "I have no involvement in the process." TRIAL TESTIMONY (Angela Copeland). The Debtor also testified that she never reviews the family's personal bank statements and that she was unaware of what their checking account balance was in June 1999. However, at her deposition, when asked if she used HCC checks to pay personal expenses, the Debtor testified as follows:

Yes. And the reason for that, such as that would be for things like dance for

the child, or after school. The circumstances surrounding that was that Brad—obviously, I carried checks from the business in my purse in case that Brad called me on the cell phone and said, hey, I need you to run by Sam's, grab me some cream cheese, or whatever, drop it by the shop for me. And so, that's why I would have checks in the purse. *And so, I said, hey, we don't have enough money in the checking account to pay for dance or this, that or the other,* so Brad said, well, then, because the business account is basically what is his job. He said, then write it out of the business account, because then that's basically—it would be like me saying okay, here I'm writing myself a check. I'm depositing it in our bank, like that. So, he said, just skip a step there, and same/same just paperwork. If that's what he told me to do it, then that's okay.

TRIAL Ex. 162, page 26, line 16 through page 27, line 3 (emphasis added). Accordingly, by her own testimony, there were, in fact, times that the Debtor was at least somewhat involved in their household finances.

 The court finds the Debtor's conduct with regards to the false 1998 tax return and, more significantly, the Sales Tax Affidavit, rose to the level of gross recklessness, satisfying the second prong of § 523(a)(2)(B)(iv). It is completely unacceptable that the Debtor believes that she can blindly sign documents upon which any reasonable person would realize are being relied upon, without any thought, care, or consideration for the contents contained therein. Additionally, when examined in totality with the other evidence submitted, the Debtor's testimony that she did not know that she was obligated to FTB on the SBA Loan is not credible, nor is her testimony that she was completely unaware of the family's financial status at the time of the Closing. Given the numerous inconsistencies within the Debtor's testimony both at her deposition and at trial, and documents introduced into evidence indicating that the Debtor was, in fact, a co-owner of HCC, combined with the actual falsities contained within the false 1998 tax return and the Sales Tax Affidavit, the court finds that the Debtor's gross recklessness evidences an intent to deceive, as interpreted by § 523(a)(2)(B).

**F**

The Plaintiffs have satisfied their burden of proof as to all of the elements necessary for nondischargeability under § 523(a)(2)(B). Accordingly, any damages or judgment assessed against the Debtor in favor of the Plaintiffs pursuant to the sale of HCC's assets shall be nondischargeable.

**VII**

The final issue before the court concerns damages. The first question is whether the court must give collateral estoppel effect, pursuant to the Full Faith and Credit Statute, to the Knox County Chancery Court Judgment obtained by the Plaintiffs against Mr. Copeland, thereby limiting the nondischargeable damages to be assessed against the Debtor to $99,053.00. If the court determines that it is not required to give collateral estoppel effect to the Knox County Chancery Court Judgment, then the court must determine and impose the correct amount of damages incurred by the Plaintiffs based upon the Debtor's wrongdoing.

**A**

 The Full Faith and Credit Statute provides that "judicial proceedings ... [of any State] shall have the same full faith and credit in every court within the United

States ... as they have by law or usage in the courts of such State ...." 28 U.S.C.A. § 1738 (1994). Accordingly, pursuant to the doctrine of collateral estoppel, or issue preclusion, state court judgments must be given "the same preclusive effect [by federal courts] as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984); *see also Bay Area Factors v. Calvert (In re Calvert)*, 105 F.3d 315, 317–18 (6th Cir.1997).

■■■■■ In order to determine if § 1738 applies, the federal court must first examine the preclusive effect of the questioned judgment under state law, and if the state court would not give preclusive effect, the federal court's inquiry ends. *Calvert*, 105 F.3d at 317. However, if the state court would give the questioned judgment preclusive effect, the federal court must also honor the judgment unless there is an exception to § 1738 applying to the federal courts. *Id.* (citing *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 105 S.Ct. 1327, 1334–35, 84 L.Ed.2d 274 (1985)). Congressional intent is the primary consideration when determining whether or not an exception exists. *Id.* at 320.

■■■■ The Supreme Court has held that collateral estoppel applies in proceedings to determine dischargeability under § 523(a). *See Grogan*, 111 S.Ct. at 658 n. 11. Moreover, there is no exception to § 1738 when a fraud issue has been fully litigated, as in this case against Mr. Copeland. *See Calvert*, 105 F.3d at 320 (citing

*In re Byard*, 47 B.R. 700, 707 (Bankr. M.D.Tenn.1985)). Ergo, in this case, if Tennessee courts would give the Knox County Chancery Court Judgment preclusive effect, the bankruptcy court must give the same preclusive effect in this dischargeability determination.

**1**

■■■■ In Tennessee, the re-litigation of an issue is barred by collateral estoppel "if it was raised in an earlier case between the same parties, actually litigated, and necessary to the judgment of the earlier case." [32] *Rally Hill Prods., Inc. v. Bursack (In re Bursack)*, 65 F.3d 51, 54 (6th Cir.1995) (citing *Massengill v. Scott*, 738 S.W.2d 629, 632 (Tenn.1987)). In fact, the doctrine of collateral estoppel renders an earlier determination by a court "conclusive on the parties and their privies in subsequent litigation, even when the claims or causes of action are different." *State ex rel. Cihlar v. Crawford*, 39 S.W.3d 172, 178–79 (Tenn.Ct.App.2000). "[M]aterial facts or questions, which were in issue in a former action, and were there admitted or judicially determined, are conclusively settled by a judgment rendered therein, and ... such facts or questions become res judicata and may not again be litigated in a subsequent action between the same parties." *Booth v. Kirk*, 53 Tenn.App. 139, 381 S.W.2d 312, 315 (1963) (quoting *Cantrell v. Burnett & Henderson Co.*, 187 Tenn. 552, 216 S.W.2d 307, 309 (1948)).

■■■■ An assertion of collateral estoppel requires a demonstration that "1) the judgment in the prior case was final and

---

32. "The doctrine of collateral estoppel or estoppel by judgment is an extension of the principle of *res judicata,* and is generally held to be applicable only when it affirmatively appears that the issue involved in the case under consideration has already been litigated in a prior suit between the same parties, even though based upon a different cause of action, if the determination of such issue in the former action was necessary to the judgment." *Home Ins. Co. v. Leinart,* 698 S.W.2d 335, 336 (Tenn.1985) (footnote omitted).

concluded the rights of the party against whom the defense is asserted, and 2) both cases involve the same parties, the same cause of action, or identical issues." *Richardson v. Tenn. Bd. of Dentistry*, 913 S.W.2d 446, 459 (Tenn.1995). Accordingly, in order to apply this standard to the matters presently before the court, it is first necessary to examine whether the parties to the Knox County Chancery Court Lawsuit are the same as the parties to this dischargeability determination. Next, the court must determine if the factors for nondischargeability under § 523(a)(2) are the same factors necessary for proving fraud under Tennessee law. Finally, the court must determine if these issues were actually litigated and conclusively decided.

**2**

The Debtor was initially a party to the Knox County Chancery Court Lawsuit; however, the Plaintiffs voluntarily non-suited their action as to the Debtor prior to the trial. Accordingly, the Knox County Chancery Court Judgment was rendered against Mr. Copeland only. Therefore, the Plaintiffs are collaterally estopped by the Knox County Chancery Court Judgment only if it is determined that the Debtor is in privity with Mr. Copeland, such that the judgment rendered against him might have been rendered against her as well.

Privity, as pertinent to collateral estoppel, "relates to the subject matter of the litigation, not to the relationship between the parties themselves." *Crawford*, 39 S.W.3d at 180 (internal citations omitted); *see also Trinity Indus., Inc. v. McKinnon Bridge Co.*, 77 S.W.3d 159, 185 (Tenn.Ct.App.2001) ("[D]ifferent parties are in privity if they stand in the

same relationship to the subject matter of the litigation."). "Privity connotes an identity of interest, that is, a mutual or successive interest to the same rights." *Crawford*, 39 S.W.3d at 180 (internal citations omitted).

Here, clearly, the Copelands are in privity with each other based upon their marital relationship. However, for the purposes of collateral estoppel, they must be in privity as to the subject matter of the Knox County Chancery Court litigation as well as the litigation presently before this court. Because both causes of action are based upon the same facts and occurrences, i.e., the Copelands' sale of HCC's assets to the Plaintiffs, the court determines that the Debtor and Mr. Copeland are in privity, as it relates to the application of collateral estoppel to this action.

Additionally, the court has determined that the Debtor and Mr. Copeland operated HCC as co-owners, finding an implied partnership. Pursuant to Tennessee law in 1999, at the time this implied partnership existed, "... all partners are liable, jointly and severally for everything chargeable to the partnership." TENN. CODE ANN. § 61–1–114(a) (1999).[33] Likewise, Mr. Copeland's fraudulent acts should be imputed to the Debtor by virtue of Tennessee law:

> Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership, or with the authority of his copartners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefore to the same extent as the partner so acting or omitting to act.

33. *See also* TENN. CODE ANN. § 61–1–306 (2002) (current law governing joint and several liability under the Revised Uniform Partnership Act adopted by Tennessee).

TENN. CODE ANN. § 61–1–112 (1999).[34] Accordingly, the Copelands, as partners in HCC, would be in privity for the purposes of any fraud perpetrated by one partner while acting on behalf of HCC.

However, in this case, the Plaintiffs did not obtain a judgment against HCC. Instead, their judgment is against Mr. Copeland, individually. As stated by the Tennessee Supreme Court,

[t]he necessary legal consequence of this several liability is that where the suit is not brought against a partnership as such, but against two individuals as joint tortfeasors, their uncontradicted proof that they were acting as partners at the time of the tort giving rise to the action would not make a judgment in favor of one of them res judicata as to the other. This is the inevitable consequence of several—or separate—liability.

*Johnson v. King,* 221 Tenn. 292, 426 S.W.2d 196, 198 (1968). Accordingly, although the parties are in privity, collateral estoppel effect cannot be applied, and the Plaintiffs may not offensively use the Knox County Chancery Court Judgment against the Debtor in this action as an adjudication of the merits. It is not necessary that the court determine the remaining issues concerning whether the factors for nondischargeability under § 523(a)(2) are the same factors necessary for proving fraud under Tennessee law or if these issues were actually litigated and conclusively decided.

**B**

Having concluded that the Plaintiffs may not rely upon the Knox County Chancery Court Judgment rendered against Mr. Copeland as a basis for assessing damages against the Debtor, the court must now determine the proper measure and amount of damages based upon the proof introduced at trial. Although the determination of dischargeability is a matter of federal law and statutorily defined as a "core proceeding" to be heard by the bankruptcy court, *see generally* 28 U.S.C.A. § 157(b)(2) (West 1993), there has been some dissension among the courts regarding whether the bankruptcy court has the authority to award money damages, which are predominately governed by state law.

The Sixth Circuit, however, has held that together with determining the dischargeability of a creditor's claims against a debtor, the bankruptcy court has the jurisdiction to adjudicate the validity of the creditor's claims and award damages thereon. *Longo v. McLaren (In re McLaren),* 3 F.3d 958, 965 (6th Cir.1993) (citing *Atassi v. McLaren (In re McLaren),* 990 F.2d 850 (6th Cir.1993)).[35] The *Atassi* decision adopted the Third Circuit's holding in *Southeastern Sprinkler Co., Inc. v. Meyertech Corp. (In re Meyertech Corp.),* 831 F.2d 410, 417 (3d Cir.1987), which provided that "an action [brought by a creditor] which has as its foundation a question of the validity of a claim which accrued under state law against the bankrupt estate prior to bankruptcy" was a core proceeding pursuant to § 157(b)(2)(B), governing the "allowance or disallowance of claims." *Atassi,* 990 F.2d at 853–54. Therefore, under the authority of the Sixth Circuit, the bankruptcy court has the jurisdiction and the authority to assess damages against the Debtor and to award damages to the Plaintiffs. Accordingly, once again, the court must look

---

**34.** *See also* TENN. CODE ANN. § 61–1–205 (2002) (current law governing liability for a partner's actionable conduct under the Revised Uniform Partnership Act adopted by Tennessee).

**35.** Both the *Longo* and the *Atassi* cases dealt with determinations of dischargeability under § 523(a).

to Tennessee state law for the appropriate measure of damages.

▮▮▮▮▮ Tennessee recognizes the tort of negligent misrepresentation and has adopted the cause of action as provided by the *Restatement (Second) of Torts* § 552. In order to state a claim for negligent misrepresentation under Tennessee law, the plaintiff must prove

> (1) the defendant supplied information to the plaintiff; (2) the information was false; (3) the defendant did not exercise reasonable care in obtaining or communicating the information; and (4) the plaintiff justifiably relied on the information.

*Staggs v. Sells*, 86 S.W.3d 219, 223 (Tenn. Ct.App.2001) (citations omitted). Negligent misrepresentation applies when "[o]ne who, in the course of his business, . . ., or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions . . . ." *Robinson v. Omer*, 952 S.W.2d 423, 427 (Tenn.1997) (quoting RESTATEMENT (SECOND) OF TORTS § 552). The appropriate measure of damages for negligent misrepresentation is the "benefit of the bargain . . . [which] allows the plaintiff to recover the difference between the actual value of the property . . . received . . . and the value that the property would have possessed if [defendant's] representations had been true." *Staggs*, 86 S.W.3d at 225 (quoting *Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228, 233 (Tenn.Ct.App.1976)).

▮▮▮▮▮ The court has found that the Debtor recklessly, and without exercising reasonable care, signed and submitted or allowed to be submitted to the Plaintiffs the false Sales Tax Affidavit and the false 1998 tax returns, both of which were material and upon which the Plaintiffs relied when they purchased the assets of HCC. This occurred in the sale of HCC's assets, for which the Debtor obtained a pecuniary benefit. All of the necessary elements of negligent misrepresentation have been met.

As to damages incurred as a result of purchasing the assets of HCC from the Copelands, the Plaintiffs testified that they paid a purchase price of $200,000.00, incurred various expenses, and were required to invest approximately $10,000.00 from their savings towards making the business work subsequent to the sale. As proof of their damages, the Plaintiffs introduced the following documents: (1) the Closing Statement evidencing that the purchase price for HCC's assets was $200,000.00, consisting of a $5,000.00 down payment, the payoff of the Copelands' SBA Loan in the amount of $66,838.78, and $128,161.22 paid to the Copelands at the Closing; and (2) the Knox County Chancery Court Judgment against Mr. Copeland, awarding them reimbursement of "certain expenses or special items of expenses . . ., including $2,290.00 in closing costs, $28,134.00 in interest on their mortgage, $20,949.00 in attorneys' fees, and $750.00 in accounting fees[, subject to] an offset . . . of $3,070.00, which represents the amount the plaintiffs recovered in disposing of the equipment." TRIAL EX. 7; COLLECTIVE TRIAL EX. 141 (Judgment).[36] In total, the Plaintiffs estimated that they had suffered losses in the approximate amount of $237,400.00.

A court may not award damages based purely upon speculation, as damages must be proven with a reasonable degree of certainty. *See BVT Lebanon Shopping*

---

**36.** The court may consider the Knox County Chancery Court Judgment when assessing damages incurred by the Plaintiffs in their purchase of HCC's assets without giving it collateral estoppel or res judicata effect.

*Ctr. v. Wal–Mart Stores, Inc.,* 48 S.W.3d 132, 138 (Tenn.2001); *Boling v. Tenn. State Bank,* 890 S.W.2d 32, 35–36 (Tenn. 1994). The evidence relied upon by the Plaintiffs best suggesting what amount the Plaintiffs incurred in actual damages would be the Closing Statement from the sale of HCC's assets and the Knox County Chancery Court Judgment. *See* TRIAL Ex. 7; COLLECTIVE TRIAL Ex. 141 (Judgment). As they relate to testimony and evidence presented at the trial in this case, the Closing Statement shows an actual loss of the $200,000.00 purchase price, while the Knox County Chancery Court Judgment recites that the Plaintiffs incurred closing costs of $2,290.00 and $750.00 in accounting fees for a total of $3,040.00.[37] TRIAL Ex. 7; COLLECTIVE TRIAL Ex. 141 (Judgment). After subtracting the $3,070.00 recovered by the Plaintiffs when they resold the equipment, the aggregate sum of consequential damages that the Plaintiffs proved is $199,970.00.[38]

 In addition to consequential damages, the Plaintiffs also seek punitive damages against the Debtor. "The purpose of punitive damages is not to compensate the plaintiff but to punish the wrongdoer and to deter others from committing similar wrongs in the future." *Concrete Spaces, Inc. v. Sender,* 2 S.W.3d 901, 906–07 (Tenn.1999). Under Tennessee law, punitive damages may be assessed only in cases where "a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." *Hodges,* 833 S.W.2d at 901.

A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result. A person acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another, or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation. A person acts maliciously when the person is motivated by ill will, hatred, or personal spite. A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances.

*Id.* (citations omitted). This conduct must be proved by clear and convincing evidence, as punitive damages should be awarded only in the most egregious of cases. *Id.*

 The court has found that the Debtor acted recklessly in her misrepresentations to the Plaintiffs, upon which they relied to their detriment. Although reckless conduct by a defendant does allow for the imposition of punitive damages, the court declines to do so. The Debtor's actions and inactions clearly fall within the definition of recklessness. Additionally, the Debtor's failure to read the Closing Documents and tax returns that subsequently turned out to be false prior to her execution thereof does constitute her conscious disregard of a substantial risk,

---

**37.** The Plaintiffs offered no proof as to the $28,134.00 mortgage interest or the $20,949.00 attorneys' fees awarded by the Knox County Chancellor, nor did they offer any proof as to the amount of attorneys' fees incurred in this cause of action. Accordingly, the court does not include these amounts in its award of damages.

**38.** Other than through their oral testimony, the Plaintiffs offered no additional proof as to the amounts that they claimed were used from their savings to try and salvage the business. Accordingly, they did not prove those amounts with a reasonable degree of certainty.

grossly deviating from what a reasonable prudent person would do under the same or similar circumstances. However, the court does not believe that the Debtor needs further "punishment" for this reckless conduct. In the court's opinion, the nondischargeability of a $199,970.00 judgment in favor of the Plaintiffs should deter the Debtor from engaging in this type of conduct in the future.

## VIII

In summary, the court finds that the Debtor and her husband, Bradley Copeland, operated their business, Heavenly Cheesecakes & Chocolates, as a partnership under the laws of the State of Tennessee. The Plaintiffs have not met their burden of proof that the Knox County Chancery Court Judgment obtained against Mr. Copeland should be imputed to the Debtor under partnership or agency principles, nor have they established that a subsequent judgment obtained against the Debtor personally is nondischargeable under § 523(a)(2)(A). Additionally, under Tennessee law, the doctrine of collateral estoppel does not apply, and the Knox County Chancery Court Judgment is not effective against the Debtor.

Conversely, the Plaintiffs have established the elements necessary for nondischargeability under § 523(a)(2)(B). Likewise, the Plaintiffs have established that they are entitled to consequential damages against the Debtor in the amount of $199,970.00, based upon her misconduct in the sale of the assets of Heavenly Cheesecakes & Chocolates to the Plaintiffs. The court declines to award punitive damages in this action.

A judgment consistent with this Memorandum will be entered.